Filed 5/23/22  Viasat, Inc. v. Acacia Communications, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.,<br><br>    Plaintiff, Cross-defendant, and Appellant,<br><br>    v.<br><br>ACACIA COMMUNICATIONS, INC.,<br><br>    Defendant, Cross-complainant, and Appellant. | D077111<br><br><br><br><br><br>(Super. Ct. No. 37-2016-00002323-CU-BC-NC) |

APPEALS from a judgment and orders of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Affirmed in part and reversed in part.

Horvitz & Levy, John A. Taylor, Eric S. Boorstin and Scott P. Dixler; Fitzgerald Knaier and Kenneth M. Fitzgerald; Colin L. Ward of Viasat, Inc., for Plaintiff, Cross-defendant, and Appellant.

Procopio, Cory, Hargreaves & Savitch and Kendra J. Hall; Wilmer Cutler Pickering Hale and Dorr, William F. Lee, Lauren B. Fletcher, Rauvin A. Johl, Thomas G. Sprankling and Joseph M. Levy for Defendant, Cross-complainant, and Appellant.

This dispute arises from a development and license agreement between Viasat, Inc. and Acacia Communications, Inc. that initially led to a productive business relationship, but ultimately led to litigation and these appeals. Viasat agreed to provide one intellectual property (IP) component for Acacia's communication products, and to license another, in exchange for a fixed fee and royalties on the licensed component (the Agreement). The parties also agreed to protect each other's confidential information, and to cap Agreement-related damages of either party to the aggregate amount paid by Acacia under the Agreement (except for confidentiality breaches). Acacia developed, sold, and paid royalties on two products, Everest and K2, ultimately paying Viasat a total of $12.8 million. Acacia then developed and sold three later-generation products that were backwards compatible with Everest, but did not pay royalties on them.

Viasat sued for breach of contract, breach of the implied covenant of good faith and fair dealing, and trade secret misappropriation, asserting, in substance, that it would be impossible to achieve backwards compatibility with the Everest product without its licensed IP.[1] Acacia maintained it independently and permissibly developed its later-generation products. The case proceeded to a jury trial, at which the trial court declined to give certain instructions requested by Acacia. The jury found Acacia liable for breach of contract, breach of the implied covenant, and misappropriation, awarding $49 million in contract damages (and the same amount, in the alternative, for breach of the implied covenant) and $1 in misappropriation damages.

The parties filed several posttrial motions, the trial court denied most of them and entered judgment, and both parties appealed. Acacia contends

---

[1] Acacia filed a cross-complaint, which is not before us.

2

the judgment on breach of contract must be reversed because there was no substantial evidence the Agreement required Acacia to pay royalties on its later-generation, backwards-compatible products, given the meaning of certain Agreement terms, and the court erred by rejecting its proposed jury instructions and declining to apply the damages cap. Acacia also argues the implied covenant claim fails as a matter of law, because the Agreement covers the matters at issue, and there was no misappropriation, because the Agreement authorized Acacia's use of Viasat's trade secrets. On cross-appeal, Viasat argues the jury's $1 misappropriation damages award was improper, and the court erred in denying its motion for costs of proof.

We conclude Acacia establishes the judgment must be reversed as to breach of the implied covenant and trade secret misappropriation. However, Acacia does not establish the judgment should be reversed as to breach of contract, and Viasat does not establish any reversible error. We reverse the judgment as to the implied covenant and misappropriation claims, and the judgment and orders are otherwise affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

I.    *Underlying Events*[2]

At its core, this case is a dispute over how Acacia could use Viasat's technology under their Agreement. We begin by introducing the parties and technology at issue; then describe the terms of their business relationship, and initial products; and, finally, explain how Acacia's development and sale of its later-generation products without paying royalties led to litigation, trial, and, eventually, these appeals.

---

[2]    Parts of the record are sealed, but some sealed matters were discussed in unsealed transcripts or the parties' briefs here. We need not and do not discuss material that remains sealed in any detail.

3

A.     *Overview of Parties and Technology*

In 2009, Acacia was a start-up company aiming to develop a fiberoptic communication product that could transmit data at 100 gigabits per second—10 times faster than most communications at the time. The product, which is an "application specific integrated circuit" (ASIC) or chip, or the module containing the chip, also had to address the errors that occur in fiberoptic transmission.

Viasat was an established company with a division that specialized in modem work, including error correction for communications products (ECC, also known as Viasat Cleveland). Acacia approached Viasat to develop IP cores for Acacia's chip. An IP core is "a collection of intellectual property that allows its recipient to exercise a certain function," and each chip can have a "variety of different types of circuitry."

Under the parties' Agreement, the terms of which we discuss below, Viasat provided Acacia with a DSP Core and an SDFEC Core. The DSP Core conducts "digital signal processing," by creating a data signal for transmission and processing received signals to remove distortions and errors. The SDFEC Core handles "soft decision forward error correction," meaning redundant data is included in the signal to help process data that was corrupted in transit ("forward error correction"), along with a reliability value that further reduces errors (the "soft decision" aspect). The SDFEC Core has both an "encoder" and a "decoder."

In providing these components, Viasat supplied documents for the IP Core design process, not physical items. The process includes "high-level specifications," or the general design; "low-level specifications," the specific design and "most important" part of the process; and "source code," which is used to create software instructions for the manufacturer that physically

4

fabricates the chip. Viasat also provided manuals and programs "to run performance simulations," among other materials.

B.    *Parties' Joint Business Relationship*

We now explain the contractual terms and resulting products of the parties' joint business relationship, which appeared to go well for a time.

In June 2009, Acacia and Viasat signed a nondisclosure agreement (NDA). The NDA's stated purpose was to permit the parties to exchange confidential information to explore or support a "joint business relationship." The NDA required the parties to make confidential information "available only to those . . . employees . . . having a need to know and solely for the Purpose of this Agreement . . . ."

Later that month, Viasat prepared a white paper for Acacia titled "100G Soft-Decision FEC Selection Analysis," which recommended a particular forward error correction approach for Acacia's desired usage.

In November 2009, the parties signed an IP Core Development and License Agreement (the Agreement) which was to be interpreted under Delaware law. Acacia's payments to Viasat under the Agreement were based on the parties' ownership rights to the technology to be developed by Viasat.

The DSP Core was "Foreground Information," or IP rights owned by Acacia. (Agreement Section 1(j), 3(a).) Acacia paid a $3.2 million fixed fee for development services, which it viewed as payment for ownership of the DSP Core. (Section 2(b).)

The SDFEC Core was "Background Information," which was defined as IP rights owned by Viasat and included all related "technical data, manuals and other documentation and data." (Section 1(b).) The SDFEC Core was also the basis for "Licensed Materials," which was defined as:

> "[T]he SDFEC Core provided to ACACIA . . . in whatever form provided
> . . . or however designated . . . and including all changes, additions,

5

revisions, replacements, manuals and documentation thereto which VIASAT may provide under this Agreement." (Section 1(k).)[3]

"[I]ncorporat[ion]" of "any part" of the Licensed Materials was what made an Acacia chip a "Licensed Product" under the Agreement—meaning the product was subject to royalty payments, but was also within Acacia's license to develop and sell. (Sections 1(l)-(m) [definitions of "Licensed Products," and "Royalty Bearing Products"]; 4(a) ["License"]; 4(b) ["Recurring License Fee"].) There was a limited royalty-free license for use of Background Information in certain circumstances. (Section 3(b).)

The Agreement also imposed confidentiality obligations on the parties, including by incorporating the NDA (Section 9), and limited damages to the amount paid by Acacia under the Agreement, subject to a confidentiality breach exception (Section 13).

Acacia developed and sold its first two products, Everest and K2, which the parties agree incorporated the SDFEC Core, and paid over $9.5 million in royalties to Viasat.[4] Added to the $3.2 million fixed fee, Acacia paid Viasat a total of $12,821,000 under the Agreement.

C. *Acacia's Later-Generation Products*

The parties' joint business relationship did not last. Acacia later developed the three products at issue here, Sky, Denali, and Meru. Each product had a mode that was backwards-compatible with Everest, and other

---

[3] The definition concluded by stating, "For the avoidance of doubt, source code for Licensed Materials shall not be delivered to ACACIA under this Agreement and shall not be a Licensed Material." (Section 1(k).)

[4] K2 only incorporated the SDFEC Core decoder, and it is not backwards compatible with Acacia's first product, Everest.

6

modes that were not. Acacia did not pay royalties on these later-generation products.

Internal communications reflected Acacia's executives had considered various options for forward error correction for its later-generation products. During one email discussion about developing a new FEC, cofounder and former president Christian Rasmussen said, in part, that he did not think "royalty savings alone justifie[d] such a big undertaking." Vice President of Engineering Bhupendra Shah stated, "We have a sword hanging over our heads because ECC [i.e., Viasat Cleveland] owns the SDFEC. We need to remove it." Acacia ultimately elected to develop new SDFEC technology, and included backwards compatibility with Everest to satisfy customer requests.

Communications during development of the later-generation products reflected Acacia engineers had access to Viasat's IP. The lead engineers on the project were Pierre Humblet and Gary Martin. Humblet told Rasmussen over email that he "embarked on direct comparison with the ECC [i.e., Viasat Cleveland] decoder . . . ." Rasmussen later contacted another Acacia cofounder and executive, Mehrdad Givehchi, over personal email, and asked "[C]ould you give Pierre this document on a USB stick? He asked for the ECC white paper on FEC but I don't want to mail it from the company account[,] just in case silly things should happen down the road." One of Acacia's other engineers who was working on the later-generation products, engineer Peter Monson, emailed Humblet, copying Martin, stating, "I started the [d]ecoder specification, but didn't get very far. I've just added the Acacia header and updated some of the format and front material. [¶] . . . The rest is copied from the Everest spec." Humblet and Martin testified at trial about the development process, as we describe *post*.

When Viasat learned Acacia was developing backwards compatible products, it expressed doubt to Acacia that this was possible without use of its SDFEC Core and sought royalties. Acacia refused, taking the position that it developed its products independently and did not misuse Viasat's technology or exceed the scope of its license. Acacia has maintained this position throughout the parties' dispute, even after its engineers later acknowledged they incorporated the parameters needed for backwards compatibility from the SDFEC Core design specifications for Everest. Viasat disagreed that Acacia did nothing wrong, and filed suit.

## II.    *Litigation*

### A.    *Lawsuit*

In 2016, Viasat sued Acacia for breach of contract, breach of the implied covenant of good faith and fair dealing, and trade secret misappropriation. Viasat alleged it would have been impossible for Acacia to develop backwards compatible products without incorporating Viasat's SDFEC Core or other Background Information (i.e., as defined in the parties' Agreement). Viasat later filed an "amended trade secret identification" in the trial court, which described seven alleged trade secrets at issue.

### B.    *Trial and Opening Statements*

The matter proceeded to a jury trial in 2019. During Viasat's opening statement, it told the jury, among other things, that Acacia copied Viasat's specifications and did not pay the royalties that it owed Viasat, and that the exception to the damages cap applied, because there were "breaches of Clause 9, confidentiality or the NDA." Acacia acknowledged that "of course" it copied "certain documents that came from Viasat, like the product specifications," stating the "question here is whether that is something Acacia was allowed to do under the agreement." Acacia also disagreed there was a breach of

8

confidentiality. The jury then heard extensive witness testimony.[5]

C.     *Witness Testimony*

Viasat executives testified Acacia owed royalties payments on its backwards-compatible, later-generation products and its failure to pay such royalties led to the lawsuit. Viasat's chief technology officer, Sameep Dave, explained that to make products backwards compatible with Everest, you "need the specifications . . . ." Russell Fuerst, who was vice president and general manager of Viasat Cleveland, was involved in the negotiations with Acacia. He testified that Viasat considered Acacia's later-generation products to be Licensed Products, because they "includ[ed] licensed material," like the low-level specifications, and therefore were subject to royalties. He agreed that if Acacia "had paid royalties," Viasat would "definitely not" have sued. Dattakumar Chitre, who was head of Viasat Cleveland and oversaw negotiations with Acacia, similarly testified, "These are licensed products and there was royalties. That was really the trigger, you know, that implied that they owe us money."

Acacia's witnesses maintained the later-generation products did not incorporate Viasat's IP or require payment of royalties. Shah, who led Acacia's negotiations with Viasat, testified Acacia could not have "incorporated the SDFEC from Everest" into its later-generation products because it "burned too much power," and Acacia did not incorporate any part of the SDFEC Core or owe any royalties on the later-generation products. When asked about his email regarding the "sword hanging over [their] heads because ECC owns the SDFEC," he said the email referenced "[n]ot just a royalty obligation. It was the fact that we would have to use their core."

_____

[5]     We focus here on testimony regarding the parties' products and dispute, and discuss other testimony relevant to their arguments *post*.

9

Acacia senior chip architect Lawrence Pellach also testified the later-generation products did not incorporate "the SDFEC Core from Viasat," and it would not have been possible because it used too much power.

Engineers Humblet and Martin described their work on Acacia's later-generation products. Humblet was the lead designer on the SDFEC Core for the later-generation products. He denied he incorporated Viasat's SDFEC Core in his designs, and concurred it "use[d] too much power." He acknowledged that he reviewed Everest manuals, "primarily SDFEC encoder specifications," for formatting parameters to design a backwards compatible decoder, but said the manual did not teach "how to design the decoder." He also said the 2009 Viasat white paper was not useful, as it was part high-level discussion and part depiction of Everest's capabilities. When asked if, in talking about copying "formatting parameters," he was "actually talking about copying the entire SDFEC code," he responded, "Yeah. The way to encode the information, yes." Then, when asked about his email to Rasmussen regarding doing a "direct comparison," he further admitted Acacia used an Everest simulator for later projects, including a planned (but not completed) comparison of Sky and Everest's error correction capabilities.

Martin worked on the design and source code for the later-generation products, and maintained they were new and not redesigns of Everest. He said Sky took two years to develop, and Denali and Meru took two years as well. Martin explained Acacia developed the later-generation products to improve on Everest's power use and/or speed, and they did not "reuse[] the SDFEC from Everest . . . ." Martin stated the later-generation products also could do more "things" than Everest. Martin acknowledged he used portions of the Everest encoder source code for Sky, because he "needed to make [it] backwards compatible"; did not "want to rewrite stuff that would be the

10

same"; and it is "more error prone" to do so.  Martin did not like the term "copy," because although "pieces . . . [have] to be there for backwards compatibility," he "completely rewrote the code."  He also looked at the low-level specification for the Everest encoder for backwards compatibility parameters, but said the parameters are a "tiny piece of the decoder."

The parties also provided expert testimony on damages.  Viasat's expert Stephen Prowse testified Acacia owed a total of $49,303,982 in contract damages, based on royalties and contractual late fees.  Brent Bersin, Acacia's expert, agreed with the royalty calculation, but disagreed with Prowse's late fee calculation.  Prowse further testified Acacia owed nearly $289 million in unjust enrichment damages on the trade secret misappropriation claim, while Bersin opined that damages number could be $32.9 million, $1.1 million, or less.

D.    *Jury Instructions and Verdict*

The court instructed the jury that Viasat accused Acacia of breaching the contract by using its Licensed Materials to develop its later-generation products on which it refused to pay royalties and by "disclosing Viasat's confidential Background Information to people who were not authorized to see it," among other things.  Acacia also requested instructions that the court refused to give; we discuss these instructions, and other instructions pertinent to the parties' arguments, in our analysis below.

After counsel presented closing arguments, the jury deliberated for multiple days.  In its special verdict form, the jury found Acacia breached the contract in a split vote and awarded contract damages of $49,303,982, but it was not asked to specify the grounds for breach or damages.  The jury also found Acacia liable for breach of the implied covenant of good faith and fair dealing, in split votes on the elements of the claim, and awarded the same

11

amount of damages as for breach of contract (stating this was "not in addition" to the contract damages). On the trade secret claim, the jury found Acacia misappropriated each of Viasat's trade secrets and that such misappropriation was willful and malicious, again in split votes on the elements, and awarded $1 in unjust enrichment damages.

E.      *Posttrial Proceedings*

Acacia unsuccessfully moved for judgment notwithstanding the verdict (JNOV) on liability. The trial court found there was "ample evidence that [Acacia] either failed to pay royalties for use of contracted-for materials within the products that were covered by the contract or used the contracted-for materials in new products that were outside the scope of the contract . . . ." The court rejected Acacia's claim that the implied covenant of good faith and fair dealing did not apply because the Agreement covered the matters at issue, and instead found there was a "gap" to the "extent that the contract does not specify when or how [Acacia] may begin to use materials that contain [Viasat's] proprietary components . . . without paying further royalties." On misappropriation, the court rejected what it viewed as Acacia's "false dichotomy . . . whereby use of the technologies at issue can be *either* a breach of contract *or* misappropriation of a trade secret, but not *both*," explaining the trade secrets could be incorporated into "other, non-licensed products." However, the court found that while the claims need not be "mutually exclusive," the "verdict actually achieves this end–i.e. all of the damages are awarded under . . . breach of contract . . . and, under the trade secret misappropriation claim, only the nominal or de minimis amount of $1 is awarded."

Acacia also moved unsuccessfully for a partial new trial based on

12

instructional error and for judgment consistent with the damages cap. Viasat filed unsuccessful motions for JNOV or a new trial on trade secret damages and for attorney fees based in part on costs of proof. We discuss these motions and the trial court's rulings as needed in our analysis, *post*.

The trial court entered judgment in December 2019, and both parties appealed.

## DISCUSSION

### I.     *Acacia's Appeal*

Acacia contends the breach of contract judgment must be reversed due to a lack of substantial evidence that the Agreement required it to pay royalties on its later-generation products, and the trial court at least should have given its requested instructions and applied the damages cap. Acacia further contends judgment on the breach of implied covenant claim fails as a matter of law, because the Agreement covers the conduct at issue. On misappropriation, Acacia argues Viasat authorized use of its trade secrets.

We conclude Acacia's breach of contract contentions are unfounded, but the implied covenant and misappropriation arguments have merit and support a partial reversal of the judgment.

### A.     *Overview of Applicable Law*

#### 1.     *Delaware Contract Interpretation*

The parties agreed Delaware law controlled the terms of their Agreement. Accordingly, we will begin with an explanation of the principles governing our analysis under Delaware law.

"To determine what contractual parties intended, Delaware courts start with the text. 'When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions,' without resort to extrinsic evidence. [Citation.] To aid in the interpretation of the

13

text's meaning, 'Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.' " (*Sunline Comm. Carriers v. CITGO Petrol.* (Del. 2019) 206 A.3d 836, 846 (*Sunline*).)

"The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.' " (*Sunline, supra*, 206 A.3d at p. 846; *Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC* (Del. 2015) 112 A.3d 878, 891 fn. 45 (*NorthPointe*) [interpretation which "gives . . . reasonable, lawful, and effective meaning to all the terms is preferred" to one "which leaves a part unreasonable, unlawful or of no effect"].)

"If, after applying these canons of contract interpretation, the contract is nonetheless 'reasonably susceptible [to] two or more interpretations or may have two or more different meanings,' [citation] then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent." (*Sunline, supra,* 206 A.3d at p. 847; see also *Exelon Generation Acquisitions, LLC v. Deere & Co.* (2017) 176 A.3d 1262, 1267 ["If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."].) The " 'resolution of the ambiguity' " generally is " 'a trial issue for the jury.' " (*GMG Capital Inv. v. Athenian Venture* (Del. 2012) 36 A.3d 776, 783, fn. 27.)

2.    *Standard of Review*

Although "courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum." (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d

14

1006, 1012; accord, *Saw v. Avago Technologies Limited* (2020) 51 Cal.App.5th 1102, 1108 [applying California appellate standards of review].)

For a judgment and order denying JNOV, the standard of review is "whether any substantial evidence—contradicted or uncontradicted— supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68, accord *Hurley v. Department of Parks & Recreation* (2018) 20 Cal.App.5th 634, 644.) An order on a new trial motion generally is reviewed for abuse of discretion, with underlying determinations "scrutinized under the [appropriate] test." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859 (*Aguilar*).)

To the extent the appeal raises pure issues of law, including regarding contract interpretation, we review these issues de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; see *Coral Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 726.) " 'When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence.' " (*Coral Farms*, at p. 726.)

Only prejudicial error is grounds for reversal. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–574 (*Soule*).) It is the appellant's burden to "show not only that the trial court erred, but also that the error was prejudicial . . . ." (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772 (*Hoffman*).)

B.      *Viasat Established Liability for Breach of Contract*

The trial court concluded ample evidence supported the jury's breach of contract verdict. We agree. There was substantial evidence that Acacia's

15

engineers reviewed design specifications for Viasat's SDFEC Core to obtain formatting parameters that would allow Acacia's later-generation products, Sky, Denali, and Meru, to be backwards compatible with its first product, Everest. The Agreement defined "Licensed Materials" as the SDFEC Core and "all . . . manuals and documentation thereto," meaning the later-generation products "incorporated" Licensed Materials. Under the clear language of the Agreement, Sky, Denali, and Meru were therefore "Licensed Products," on which Acacia owed royalties that it failed to pay.

Acacia claims it "was not required to pay royalties because (1) the accused products did not 'incorporate' Viasat's technology and, in any event, (2) the Agreement granted Acacia a 'royalty-free' license to use the SDFEC Core materials where—as here—it was necessary . . . to 'fully . . . exploit' the Foreground Information that Acacia spent $3.2 million to acquire." These contentions lack merit.

1. *Acacia Fails To Show It Did Not "Incorporate" the SDFEC Core In Its Later-Generation Products*

Under the Agreement, "Licensed Products" are defined as:

"[A]ny integrated circuits (ASIC . . .) designed, manufactured, marketed or sold by or on behalf of ACACIA that *incorporate* all or any part of the Licensed Materials (regardless of whether or not the Licensed Materials are enabled or disabled in such Licensed Product)."

(Section 1(l), italics added.)

"Royalty Bearing Products" are defined similarly as Licensed Products that "incorporate all or part of the Licensed Materials . . . ." (Section 1(m).) Thus, whether Acacia owed royalties on a product turned on whether it "incorporate[d]" Licensed Materials into that product.

16

a.     *Agreement Language*

According to Acacia, the ordinary meaning of "incorporate" in the Licensed Products definition "is to put Viasat's SDFEC Core (in whole or in part) on an Acacia chip," meaning "Viasat's Background Information is partially or fully *embodied* in Acacia's physical devices."  Viasat responds that "incorporate" does not require physical incorporation, as the technology is just a "collection of [IP]," and that the "term 'incorporate' . . . cover[s] products designed using Licensed Materials . . . ."

Given the nature of the technology, we conclude the only reasonable interpretation of the disputed term "incorporate" is that urged by Viasat. Dictionaries define the word "incorporate" as meaning to "unite or work into something already existent so as to form an indistinguishable whole" (Merriam-Webster Online Dict.), and incorporation thus can be conceptual. (*Ibid.* [citing example, "This design *incorporates* the best features of our earlier models"]; Oxford English Dict. ["[t]o combine or unite into one body or uniform substance"; examples include "figurative" and "literary material" uses]; see Cambridge Dict. [noting example, "The program incorporates a powerful graphics tool"].)  The conceptual meaning is the only one that can apply here, where the technology consists of intangible materials like design specifications.

Further, this broad, conceptual interpretation is consistent with the rest of the Agreement and the robust royalty obligation it imposes.  The Agreement broadly defines Licensed Materials to include materials like "manuals and documentation" (Section 1(k)); broadly defines Royalty Bearing Products as Licensed Products that incorporate all or part of Licensed Materials (Section 1(m)); and imposes a per-unit recurring royalty fee on each

17

Royalty Bearing Product sold (Section 4(b)).  The clear language of the Agreement as a whole reflects the parties generally intended for Acacia to pay royalties whenever it sold products incorporating any part of Viasat's Licensed Materials—including parameters drawn from design specifications. (See *Chicago Bridge & Iron v. Westinghouse* (Del. 2017) 166 A.3d 912, 913–914, 926–927 (*Westinghouse*) [courts must give "sensible life to a real-world contract," interpreting contracts in light of the parties' "basic business relationship" and the applicable "commercial context"].)

Acacia's arguments lack merit.

First, in an effort to rebut Viasat's interpretation, Acacia urges us to draw a distinction between the term "incorporate," which it describes as "narrow," and the term "use," which it states is a "broad term" that is "plainly different from . . . 'incorporate.' "  This distinction does not assist Acacia.  The term "use," standing alone, may have a broad meaning.  (See Merriam-Webster Dict. ["use" is "to put into action or service" or "employ"].)  But "designed using" (as in Viasat's contention that " 'incorporate' . . . cover[s] products designed using Licensed Materials") suggests a *kind* of use—one akin to the conceptual form of incorporate, as the dictionary examples reflect. (See Merriam-Webster Online Dict. ["This design incorporates."].)

Second, we reject Acacia's attempt to justify its payment of royalties on K2, but not on its later-generation products.  According to Acacia, K2 used the SDFEC Core decoder, and therefore incorporated the SDFEC Core.  In contrast, it describes "formatting parameters" as a "nebulous concept," and contends that its use of formatting parameters from Everest to allow for backwards compatibility in its later-generation products did not constitute "incorporation."  Acacia's distinction is specious.  Both the decoder and the formatting parameters were conceptual, because what Viasat provided to

18

Acacia were *design specifications* and other IP.  For both K2 and the later-generation products, incorporation of Licensed Materials resulted in Licensed Products on which royalties were owed under the plain language of the Agreement. (Sections 1(k)-1(m), 4(b).)

We conclude the contractual meaning of "incorporate" is clear, and need go no further.  (*Sunline*, *supra*, 206 A.3d at p. 846.)

b.    *Extrinsic Evidence*

Even if we were to reach the extrinsic evidence, however, Acacia's arguments as to this evidence are unpersuasive.  We explain why.

First, Acacia directs us to the parties' negotiation history, contending the parties "remov[ed]" the word " 'use' " from the Licensed Products definition and Viasat cannot now enforce the term.  Acacia relies primarily on *GRT, Inc. v. Marathon GTF Tech., Ltd.* (Del. Ch. June 21, 2012) 2012 WL 2356489 (*GRT*), which stated that "a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."  (*Id.* at *7.)  But the evidence regarding the negotiation history discloses no such failure to obtain a contractual right, so this principle does not assist Acacia. We explain.

Contemporaneous documents reflect the Licensed Product definition initially read:  "incorporate all or any part of the Licensed Materials or were designed using any of the Licensed Materials."  Those documents further reflect that Shah, Acacia's lead negotiator, removed "designed using any of the Licensed Materials," leaving the current language (i.e., "incorporate all or any part of the Licensed Materials").  Shah then testified at trial that he removed the term "designed using" for flexibility, which "made it very clear" that if Acacia later "had to use . . . background materials," such as "to design a backward compatible product," then it "didn't have to pay a royalty."

19

Fuerst, one of Viasat's negotiators, confirmed Shah deleted the "designed using" language, but testified Viasat's position was that the phrase "designed using any of the Licensed Materials" was "redundant" of the phrase "incorporate all or any part of the Licensed Materials." Chitre, who led negotiations for Viasat, likewise opined that Shah's removal of "designed using" did not change the meaning of the Licensed Product definition, because "incorporation implies" the phrase "designed using . . . ."

We recognize that Shah testified his removal of the "designed using" language "made it very clear" Acacia did not have to pay royalties to use Background Materials, like the SDFEC Core, for backwards compatible products. But Acacia identifies no evidence that Shah communicated this intent at the time the language change was made, and Viasat's witnesses state they viewed his removal of the term as eliminating a redundancy. Mutual intent is " ' "determined objectively based upon . . . expressed words and deeds . . . at the time rather than by . . . after-the-fact professed subjective intent." ' " (*Eagle Force Holdings, LLC v. Campbell* (Del. 2018) 187 A.3d 1209, 1230, fn. 144 (*Eagle Force*).)

Accordingly, although *GRT* does state a party cannot "enforce a contractual right that it did not obtain" in negotiations (*GRT*, *supra*, 2012 WL 2356489, at *7), Acacia does not establish this principle applies here. Further, both *GRT* and *LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.* (Del. Ch. 2017) 2017 WL 6629209, also cited by Acacia, did involve attempted reliance on rejected terms, and are thus distinguishable. (*GRT*, at *1-2, 7 [granting summary judgment for defendant that did not breach contract by failing to keep facility open, based on plain language of contract; alternatively finding extrinsic evidence showed plaintiff "sought . . . a specific bar on [defendant's] ability to shut down the [facility] before December 31,

20

2012 and it failed to obtain that right"]; *LSVC*, at *5, 9–11 [declining to enforce against defendant tax provisions that it "explicitly struck"; "drafting history demonstrate[d] that [defendant] rejected the proposed provisions that would have produced the outcome [plaintiff] now desires"].)

Second, we reject Acacia's argument that both parties' witnesses agreed with its "basic understanding" of the term "incorporate." The record shows the witnesses plainly did not agree.

Shah testified, consistent with Acacia's position here, that incorporate means to "take the licensed material . . . , and . . . physically put it in the product" or "put it in the chip." When asked about manuals and documentation, Shah said "you can't incorporate that." But, as noted above, Viasat witnesses Fuerst and Chitre viewed the terms "incorporate" and "designed using" as synonymous. Fuerst further testified Acacia's later-generation products "incorporate[d] the design" for the Everest decoder, and "include[d]" and were "developed using" licensed materials, "such as the low-level specifications." He also confirmed "[n]othing is actually physically going inside the chip."

Acacia seemingly ignores the foregoing testimony by Viasat witnesses, and instead directs us to instances where Fuerst described Licensed Products as those where the SDFEC is "in [the product]" or "on it," and, for Acacia's later products, stated the "Everest spec is on the chip." These passing references to Fuerst's testimony do not change the fact that Fuerst expressly rejected Shah's view that "incorporate" means something is "physically" on the chip. Further, we note that Shah's view that "you can't incorporate" things like documentation and manuals lends support to *Viasat*'s interpretation. These items are in the Licensed Materials definition, so an

21

interpretation that renders them surplusage—like Shah's, and by extension, Acacia's—is disfavored. (See *Sunline, supra,* 206 A.3d at p. 846.)

Finally, Acacia contends its witnesses testified "incorporating Viasat's SDFEC Core" into the later products was not "technically feasible because it consumed too much power . . . ." The witnesses indicated "the SDFEC from Everest" and "the SDFEC Core from Viasat" used too much power, suggesting they meant the *entire* Everest SDFEC Core. As Acacia engineer Martin explained, the later-generation products were intended to reduce power use from Everest, increase speed at the same power use, or both. Acacia cites no testimony that incorporating *part* of Viasat's SDFEC Core presented any kind of power issue.

2. *Acacia Does Not Show The Section 3(b) Royalty-Free License Applies*

Section 3 is titled "Foreground Information." Section 3(a) provides Acacia owns the Foreground Information, and Section 3(b) states:

"If any part of the Foreground Information is based on, incorporates or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, modified, distributed or otherwise exploited, without using any Background Information, then VIASAT hereby grants and agrees to grant to ACACIA a limited, nonexclusive, perpetual, irrevocable, worldwide, royalty-free, sublicensable right and license to make, have made, use and have used, sell, import, export, reproduce, modify and make derivative works of such Background Information for the sole and exclusive purpose of design, simulation, implementation, manufacture and sale of Licensed Products (including any modifications, improvements and derivatives to Licensed Products) or otherwise in connection with ACACIA's exploitation of the Foreground Information. VIASAT agrees not to use or disclose any Background Information under this Agreement for which it is not fully authorized to grant the foregoing license."

a. *Agreement Language*

22

Acacia argues Section 3(b) "provides that if Acacia's Foreground Information (including the DSP Core) 'cannot be reasonably and fully made, used, . . . or otherwise exploited, without using any Background Information [i.e., the SDFEC Core],' Acacia has a 'royalty-free' license to use that Background Information 'in connection' with its 'exploitation of the Foreground Information.' " Viasat contends Section 3(b) provides a royalty-free license only for listed activities relating to Licensed Products and the concluding "otherwise . . . exploit[]" phrase is a catch-all for additional such activities.

Viasat's interpretation again is the only reasonable one. The royalty-free license is for "the sole and exclusive purpose of design, simulation, implementation, manufacture and sale of Licensed Products," and the rest of the language in Section 3(b) must be considered in light of this express language—including both instances of "otherwise . . . exploit[]" in the section. (*NorthPointe*, *supra*, 112 A.3d at p. 891 fn. 45.) Viewed as a whole, Section 3(b) accounts for chip development work, like simulation and manufacture, that uses both Foreground Information and Background Information, but should not trigger a royalty payment. The concluding "otherwise . . . exploit[]" language reasonably serves a catch-all function, by capturing similar tasks such as testing, marketing, and replacing defective products, that also should not incur royalties. (See *Aspen Advisors LLC v. United Artists Theatre* Co. (Del. 2004) 861 A.2d 1251, 1265 ["ejusdem generis" rule provides that  " ' "where general language follows an enumeration . . . ., such general words are not to be construed in their widest extent, but are to be held as applying only to . . . things of the same general kind . . . as those specifically mentioned" ' "].)

23

Further, this interpretation is consistent with the rest of the Agreement. As we explained above, the Agreement as a whole generally requires Acacia to pay royalties whenever it sells products incorporating Viasat's Licensed Materials, which includes the SDFEC Core. (Sections 1(k), 1(m), 4(b).) (*Westinghouse, supra*, 166 A.3d at pp. 913–914, 926–927 [courts must interpret contracts in light of "basic business relationship"].)

Acacia's position is not reasonable. First, Acacia's opening brief analysis, which we describe above, selectively quotes from Section 3(b) to focus on the references to Acacia's exploitation of its Foreground Information. Acacia omits the "sole and exclusive" language in Section 3(b) (and acknowledges the royalty-free license has a purpose related to Licensed Products only in passing, in its statement of facts). Viewing the language about the Foreground Information in isolation is neither reasonable, nor consistent with the principle that courts must view contract language in context. (*Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.* (Del. 2010) 996 A.2d 1254, 1260 (*Stonewall*) [" '[a] single clause or paragraph of a contract cannot be read in isolation, but must be read in context' "].)

Nor is Acacia's belated attempt to address the "sole and exclusive purpose" language on reply persuasive. There, Acacia contends Section 3(b) provides a royalty-free license in "two circumstances": with "Licensed Products under certain circumstances (i.e., for the sole and exclusive purpose . . .)" *or* "when used in connection with the Foreground Information," and that the latter is an "entirely separate provision." Acacia is essentially still urging us to view the Foreground Information language in isolation, which we may not do. (*Stonewall, supra*, 996 A.2d at p. 1260.) Acacia relatedly argues that a narrow reading of the phrase "or otherwise in connection with Acacia's exploitation of the Foreground Information" would "violate the principle that

24

ejusdem generis 'does not apply when the context shows a contrary intention.' " It is Acacia that is ignoring the context of the broader provision.

Second, we reject Acacia's argument that Section 3(b) "allow[s] Acacia to fully exploit the Foreground Information for which it paid $3.2 million." Acacia had a right to exploit the DSP Core consistent with the Agreement, which generally requires payment of royalties for incorporation of the SDFEC Core in its chips. Further, there is nothing incompatible with paying a fixed fee for one technology component, and on-going royalties for a different component—just as Acacia did here, on Everest and K2.

We conclude the royalty-free license language in Section 3(b) is clear. (*Sunline, supra*, 206 A.3d at p. 846.) We next address the extrinsic evidence, to explain that: (i) even if we considered the parties' negotiation history, it would not support Acacia's interpretation; and (ii) even applying Acacia's interpretation, the jury could disagree that Acacia needed Viasat's SDFEC Core to exploit its DSP Core.

b. *Extrinsic Evidence*

Acacia contends the negotiation history reflects the parties "considered—but declined to adopt—a narrow version of the Section 3(b) royalty-free license." Acacia further argues that Viasat's evidence, including its rejection of an early, broader version of the provision and a memorandum by counsel, do not support its interpretation. We summarize that history, and then explain why Acacia's assertions lack merit.

Contrary to Acacia's characterization, the negotiation history reflects Acacia tried and failed to obtain a *broad* royalty-free license, and then agreed to a *narrow* version proposed by Viasat, with only the minimal addition of concluding catch-all language. Acacia first proposed Section 3(b), with a royalty-free license to "exploit . . . all . . . Background Information in support

25

of [Acacia's] . . . exploitation of the Foreground Information, Development Services, or Deliverables . . . ." Viasat executive Fuerst testified Viasat did not accept the proposed language. He said Shah, Acacia's lead negotiator, explained in a follow-up telephone call with him that Acacia would pay a license on products sold, but this provision would let them simulate the SDFEC to assess performance and provide information to customers. Fuerst said he relayed their call to Viasat counsel Ted Gammell, and confirmed the accuracy of Gammell's email memorandum summarizing what Fuerst told him (i.e., Acacia wanted the section "only for the purposes of the licensed products"). Fuerst then testified he added the language, "for the sole and exclusive purpose of design, simulation, implementation and manufacture" of Licensed Products," after which Shah added "and sale [of Licensed Products] . . . or otherwise in connection with ACACIA's exploitation of the Foreground Information," without comment.

Later, at trial, Shah disputed the "otherwise . . . exploit[]" language he added was "just a catch-all," and stated it was "another purpose for which [Acacia] get[s] a royalty-free license." Viasat executive Chitre maintained Viasat interpreted the language to mean "additional things like, . . . marketing, display, testing, things like that."

Turning back to Acacia's arguments, Acacia focuses on Shah's addition of the concluding "otherwise . . . exploit[]" language and Fuerst's acquiescence to this addition to contend the parties "declined to adopt . . . a narrow version of the Section 3(b) royalty-free license." This portrayal of the negotiations is one-sided, and meritless. Further, to the extent Shah intended to reject "a narrow version"—or to create "another purpose" for the royalty-free license, as he claimed at trial—the intent was uncommunicated and thus irrelevant. (*Eagle Force*, *supra*, 187 A.3d at p. 1230, fn. 144.)

Acacia also contends it is irrelevant that Viasat "rejected an early draft of the Agreement [Section 3(b)]" proposed by Acacia "that more clearly permitted" royalty-free use of the Background Information, because the early draft "permitted royalty-free use of Background Information for reasons that went far beyond exploiting Foreground Information." We disagree. Viasat rejected a broad, royalty-free license that would permit Acacia to use Background Information to exploit Foreground Information for uses not limited to Licensed Products, regardless of whether other uses unrelated to Licensed Products were allowed as well. By Acacia's own reasoning, Acacia should not be able to resurrect a term it could not obtain at the bargaining table. (*GRT*, *supra*, 2012 WL 2356489, at \*7.) For similar reasons, we reject Acacia's argument that there is no evidence Viasat was concerned about backwards compatibility—one particular use—at the time.

Acacia relatedly argues Viasat's "only [other] evidence to show that the parties intended a narrow meaning" for Section 3(b) was the "self-serving hearsay memorandum" from Gammell that Acacia wanted the license "only for purposes of the Licensed Products." The memorandum was admitted at trial; Acacia did not object, and cannot do so now; and Viasat argues the record would qualify under the business records exception regardless. (*In re C.B.* (2010) 190 Cal.App.4th 102, 132 [hearsay objections "waived by the failure to object below"]; Evid. Code, § 1271.) And there *was* other evidence for Viasat's position, including Fuerst's testimony that he spoke with Shah about the section's purpose, he communicated the content of that call to Gammell, and Gammell's memorandum accurately reflected his communication. Acacia did not object to this testimony, either.[6]

---

6    Acacia argues the "author of the memo" later agreed Acacia had a royalty-free license "to enable the foreground information to be used," citing

27

c.      *Jury Could Find Acacia Did Not Need Viasat's SDFEC Core to Exploit Its DSP Core*

Finally, even if Acacia's interpretation of Section 3(b) applied, the jury could still find Acacia did not need the SDFEC Core to exploit its DSP Core and thus did not have a royalty-free license. Acacia contends that to fully exploit its DSP Core, it needed to make its later products backwards compatible to meet customer requirements, and it needed the SDFEC Core specifications to achieve backwards compatibility. The evidence does not compel this conclusion.

Even if SDFEC Core specifications were necessary for backwards compatibility (which is not in dispute), it does not follow that backwards compatibility was necessary for Acacia's later-generation products. Shah testified Acacia needed backwards compatibility to fully exploit the DSP Core, because customers at the time required it and "technical requirements come from customer requirements." Yet, he admitted they initially did not plan for Sky to be backwards compatible and "[i]n the long run [backwards compatibility] has not turned out to be important"—while still denying it was "just something that Acacia wanted to do to make more money." Meanwhile, Acacia engineer Martin testified Acacia "could have had a product that wasn't backwards compatible, but [its] main customer at the time was requesting it" and it would have been "[u]nwise because Acacia would have made less money" and "wouldn't be able to fully exploit [its] product."

---

testimony by Fuerst. He was not the author and made no such agreement. He was being asked about deposition testimony, said he must have been talking about the DSP, and elsewhere testified explicitly that the royalty-free license is "[o]nly on licensed product[s]."

28

In short, Acacia customers may have desired backwards compatibility, and parameters from Viasat's SDFEC Core may have been necessary to achieve it, but Acacia *could have* designed its later-generation products without this feature. Acacia's unspoken premise seems to be that to fully exploit the DSP Core, it had to be able to maximize profits. The jury was not required to accept it.

## C. *Acacia Does Not Establish Instructional Error On Breach of Contract*

Acacia contends the court prejudicially erred by refusing to give its proposed jury instructions on the meaning of the term "incorporate" and the royalty-free license in Section 3(b), as well as on the impact of negotiations.[7] These contentions lack merit.

### 1. *Additional Facts*

Acacia proposed a special instruction titled "Acacia's Rights Under Sections 3, 4, and 8 of the Agreement." We set forth the full instruction for context; Acacia focuses on the italicized portions in this appeal.

> "The parties' November 2009 Agreement grants Acacia certain rights regarding categories of information called 'Background Information' and 'Licensed Materials.' The Agreement defines Licensed Materials as the 'SDFEC Core provided to ACACIA as part of the Development Services hereunder' and documentation related to that SDFEC Core that ViaSat provides to Acacia under the Agreement. However, the category of information called Licensed Materials does not include source code for that SDFEC Core, and such source code is not provided under the Agreement.
> *"I will next explain what it means under the Agreement to 'incorporate' Licensed Materials into an integrated circuit. Incorporating Licensed Materials is not same as designing an integrated circuit 'using' Licensed Materials. 'Incorporate' means the Licensed Materials are included in and made a part of the integrated circuit. To*

---

[7] Acacia also raises the court's refusal to give a damages cap instruction, but as we explain in discussing the cap *post*, any such error was harmless.

29

*design an integrated circuit 'using' Licensed Materials means that the integrated circuit was made with knowledge of or by consulting or referencing the Licensed Materials.*

"If you find that Acacia incorporated all or part of the Licensed Materials into an integrated circuit, then the integrated circuit becomes known under the Agreement as a 'Licensed Product.' The Agreement allows Acacia to make Licensed Products, regardless of whether or when Acacia pays a royalty fee. Therefore, in making Licensed Products, Acacia cannot have misappropriated ViaSat's asserted trade secrets.

"Licensed Products are also known in the Agreement as 'Royalty Bearing Products.' For each Royalty Bearing Product that it sells, Acacia must pay $150 if the product has one SDFEC component and $300 if it has two SDFEC components.

"The Agreement defines Background Information as 'all Intellectual Property Rights, and other design data and information either (a) owned or licensed by VIASAT prior to the Effective Date of this Agreement, or (b) developed or licensed by VIASAT separate and apart from this Agreement. Background Information shall also include all technical data, manuals, and other documentation and data related to any of the foregoing. For the sake of clarity, and without limiting the foregoing, the SDFEC Core shall be deemed Background Information.' Background Information includes Licensed Materials and other information.

"*Section 3(b) of the Agreement allows Acacia to use Background Information for purposes of making and selling Licensed Products as well as for any other purpose necessary to fully exploit the Foreground Information.*"

The trial court stated, "This is argument, but I'll hear what you have to say, this is not an instruction." Acacia's counsel argued these were "unambiguous terms . . . ." Viasat's counsel argued the instruction was "argumentative" and "at best, [a] disputed characterization." The court ruled it would not give the instruction.

Second, Acacia proposed a special instruction titled, "Interpretation—Negotiations." It stated (italicized portions cited by Acacia on appeal):

"*A contract term may not be interpreted to give a party a*

30

*contractual right it did not obtain for itself at the negotiating table.* This principle applies with particular force when the party sought the specific contractual right at issue in negotiations but was unable to get it. This is because the purpose of interpreting contracts is to determine the parties' intent. Interpreting a contract to include a term that the parties to the contract expressly considered and rejected in the course of negotiations would give the parties rights that they had not agreed to."

The trial court said, "That also appears to be argument," and after permitting argument by counsel, refused to give the instruction.

At trial, the court instructed the jury on general principles of contract law, such as: considering the contract as a whole, not in isolated parts, and, for ambiguous or unclear terms, favoring reasonable constructions and looking to explanatory circumstances when the contract was made. During closing arguments, Acacia's counsel argued it did not incorporate Viasat's SDFEC Core and had a royalty-free license to use it, regardless, and Viasat's counsel disagreed on both counts. Both counsel addressed the parties' negotiation history.

During posttrial motions, Acacia moved for a partial new trial based on the trial court's refusal to give its proposed instructions, among other issues. The court denied the motion, setting forth the text of Acacia's proposed negotiation instruction and stating:

"[Acacia] advances the argument that it was erroneous to fail to give this instruction because . . . construction of a contract is a question of law for a court . . . . [T]he term over which the parties are fighting– language purportedly specifying that products *designed using* the 'licensed materials' could be used, with a royalty, by [Acacia]–leaves, at best, ambiguity as to what the parties intended on this issue and/or whether the parties were ultimately silent as to this matter. Accordingly, the Court rejects [Acacia's] argument that it was erroneous to decline to give this instruction.

2. *Applicable Law*

31

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case . . . which is supported by substantial evidence." (*Soule, supra,* 8 Cal.4th at p. 570.) The trial court must instruct the jury on "major subjects raised by the evidence." (*Chakalis v. Elevator Sols., Inc.* (2012) 205 Cal.App.4th 1557, 1573.) However, "[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law." (*Red Mountain, LLC. v. Fallbrook Pub. Util. Dist.* (2006) 143 Cal.App.4th 333, 359 (*Red Mountain*).)

"We review de novo the question of whether the trial court's instructions to the jury were correct. [Citations.] In evaluating the contention that an instruction was improperly refused, 'we view the evidence in the light most favorable to the appellant.' " (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 527.) However, "[i]nstructional error in a civil case is not ground for reversal unless it is probable the error prejudicially affected the verdict." (*Red Mountain*, *supra*, 143 Cal.App.4th at p. 359; accord, *Soule, supra,* 8 Cal.4th at p. 580; *id.* at pp. 580–581 [factors for consideration include the state of the evidence, the effect of other instructions and counsel's arguments, and any indications by the jury it was misled].)

3.     *Analysis*

a.     *Acacia's Proposed Instruction Regarding Acacia's Rights Under Agreement*

Acacia argues it proposed "narrowly-crafted" and "neutrally-worded" instructions on the plain meaning of "incorporate" and the royalty-free license in Section 3(b), and there "was no real dispute" about the meaning of the Agreement's term "incorporate." These arguments lack merit.

First, Acacia's proposed instruction was neither narrow, nor neutral. Despite spanning over a page, it set forth only Acacia's interpretation of the Agreement's language, and the trial court properly rejected the instruction as argumentative. (See *Red Mountain*, *supra*, 143 Cal.App.4th at p. 362 [eminent domain dispute; trial court properly declined instruction that was "argumentative and unduly emphasize[d] [party's] . . . theory"]; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 914–916 [trial court did not err in rejecting an instruction that defined a contract term; issue was what "parties themselves intended in using the term"].) Further, the court had instructed the jury on general principles of contract interpretation, including the principle that a contract should be construed reasonably and considered as a whole. These instructions were adequate to cover the subject matter. (*Red Mountain*, at pp. 360, 363 [proposed easement instruction was "substantially and less argumentatively covered" by another instruction; error " 'cannot be predicated on . . . refusal to give a requested instruction if the subject matter is substantially covered by the instructions given' "].)

Second, we reject Acacia's assertion that there was "no real dispute" as to the meaning of the Agreement's term "incorporate," such that it was error for the trial court to decline to give its instruction. As discussed above, the record reflects the parties vehemently disagreed as to the meanings of both "incorporate" and Section 3(b). Acacia is no more persuasive in arguing, in the alternative, that if "there was disagreement between the parties about the scope of these provisions, the trial court . . . should have . . . squarely resolved that legal issue," before giving the case to the jury. Acacia is assuming its interpretations were correct, but we have concluded otherwise. If the court erred at all here, it was in failing to give special instructions consistent with Viasat's position—an error favorable to Acacia.

Acacia also does not establish it was prejudiced by the court's refusal to give its proposed instruction on "incorporation" and the royalty-free license in Section 3(b).

First, Acacia argues that had its instructions been given, there is a reasonable probability that the jury would have resolved remaining factual issues in its favor and not found breach of contract. These issues, Acacia contends, were: "whether Acacia's review of SDFEC parameters and features in making the accused products backward compatible with the Everest product constituted 'incorporation,' " and "whether Acacia's limited use of Background Information to enable a backward-compatibility mode in the accused products was necessary to fully exploit its Foreground Information."

We disagree. The jury was instructed on contract interpretation principles generally, and heard Acacia's views on these issues during closing argument. Yet, the jury found a breach of contract—and reasonably could, as discussed *ante*. Acacia maintains that "there is a meaningful difference between the arguments of a party (which the jury can weigh and choose whether or not to credit) and the instructions from the trial court (which the jury must follow)." But Acacia still needs to show the *result* would have been more favorable. (*Soule, supra*, 8 Cal.4th at p. 580; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) It has not done so. The cases cited by Acacia either state general propositions, which are not in dispute, or involve erroneous argument by opposing counsel, which it has not shown here. (See *Boyde v. California* (1990) 494 U.S. 370, 384 [instructions are "binding statements of the law," and given greater weight than argument]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 660, 664 (*Whiteley*) [failure to instruct on immunity period in fraud and negligence trial was prejudicial

where, inter alia, opposing counsel "forcefully argued a continuous course of conduct," including during immunity period].)

Second, we reject Acacia's contention that the "jury's week-long deliberations and split verdict" show the jury was likely "confused or misled by the inadequate instructions." This was a complicated, six-week trial involving numerous technical issues, so deliberations were not especially lengthy. As for the split verdict, although close jury votes can be relevant to a demonstration of prejudice (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876),[8] Acacia does not establish it is pertinent here. Both parties provided robust evidentiary showings and detailed opening and closing statements, and the jury reached split verdicts on the implied covenant and trade secret issues too. Acacia identifies nothing in the record to suggest jury deliberations were impeded by the lack of additional breach of contract instructions.

Acacia's authorities are again distinguishable because, among other things, Acacia does not establish there was any jury request for clarification of the breach of contract instructions or any related special verdict questions. (See *Sandoval v. Bank of America* (2002) 94 Cal.App.4th 1378, 1389 [where jury asked for clarification of special verdict question on causation, and trial court erred in its response, nine-to-three vote on causation issue reflected error was prejudicial]; see also *Green v. California* (2007) 42 Cal.4th 254, 265 [in disability discrimination case, trial court's failure to instruct jury that plaintiff had burden to show he was qualified for the position, an element of

---

8    (See *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 256 [when civil jury "is composed of 12 persons, it is sufficient if *any* nine jurors arrive at each special verdict"]; *LeMons, supra,* 21 Cal.3d at p. 877 [" 'fact that only the bare number of jurors required to reach a verdict agreed' " can support prejudice].)

the claim, was prejudicial error]; *Whiteley*, *supra*, 117 Cal.App.4th at p. 664 [error was prejudicial due to multiple factors, including that no other instructions "lessened the prejudice" and erroneous closing argument, as well as close jury vote].)

> b. *Acacia's Proposed Instruction Regarding Negotiations*

Acacia also argues the trial court prejudicially erred by refusing its proposed instruction "that '[a] contract term may not be interpreted to give a party a contractual right it did not obtain for itself at the negotiating table,' " and the court relied on "backward" reasoning in its order denying a partial new trial due to instructional error. We are not persuaded.

First, the proffered instruction regarding negotiations was not narrow or neutral. The portion Acacia focuses on in this appeal is brief, referencing the contract interpretation principle stated in *GRT*, and discussed above, that a party cannot enforce a right it did not obtain in negotiations. (*GRT*, *supra*, 2012 WL 2356489 at *7.) But the instruction continues, indicating the principle applies when "the party sought the specific contractual right . . . but was unable to get it" and when "the parties . . . expressly considered and rejected" a term. This language references further discussion in *GRT*. (*Ibid*.) But even if case law like *GRT* were a proper source for an instruction (and Viasat disagrees it is), this use of repetitive, pointed language here implies an unsuccessful bargaining attempt occurred, which Viasat disputes. The trial court properly rejected the instruction as argumentative. (See *Red Mountain*, *supra*, 143 Cal.App.4th at p. 362; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217 [instructions that "unduly overemphasize" issues or theories "by repetition" are properly rejected].) The court also gave the jury sufficient guidance in its contract interpretation instructions, including that the jury could consider the explanatory circumstances at the time the

36

contract was made in determining the parties' intended meaning for Agreement terms.

Second, Acacia does not establish the trial court erred in its posttrial order denying a partial new trial based on the lack of instruction. As described above, the court declined to instruct on negotiations, explaining the disputed terms left "at best, ambiguity as to what the parties intended . . . and/or whether [they] were ultimately silent." Acacia contends that if the court believed the language was ambiguous, it was "especially vital . . . to give the jury the proper legal tools to . . . decipher its meaning." The court stated the disputed terms were *at best* ambiguous, and, again, it had properly instructed the jury on contract interpretation generally. (See *Red Mountain*, *supra*, 143 Cal.App.4th at p. 360 [error cannot be based on "refusal to give . . . requested instruction if . . . subject matter is substantially covered" by other instructions].)

Acacia's reliance on *Sloan v. Stearns* (1955) 137 Cal.App.2d 289 is misplaced. The portion of *Sloan* cited by Acacia involved proposed instructions in a fee dispute, which inaccurately characterized the ambiguity of the underlying contract. (*Id.* at p. 301 [instructions described attorney's "duty . . . to state the [fee] agreement in unambiguous terms"; because contract was not ambiguous, "instructions [were] inappropriate"].) Although the Court of Appeal noted that if there is ambiguity, a judge should guide the jury, it said elsewhere that if "instructions are objectionable . . . a judge in a civil case has performed his full duty in denying them" and there is no "duty . . . to modify the . . . request." (*Id.* at p. 300.) Thus, even if there were ambiguity in the Agreement's terms, Acacia does not establish the court erred by refusing to give its argumentative instructions on the meaning of those terms or the effect of the parties' negotiations.

Acacia does not establish prejudice, either. It contends the negotiation instruction would have "clarified the meaning" of the term "incorporate" and the royalty-free license in Section 3(b). But Acacia discusses only evidence favorable to its own contract interpretation (such as noting Fuerst's acceptance of the "otherwise . . . exploit[]" language in Section 3(b), but failing to mention his prior addition of the "sole and exclusive purpose[s]" language relating to "Licensed Products"). We are required to consider "whether prejudice actually occurred in light of the *entire record*." (*Soule, supra,* 8 Cal.4th at p. 580, italics added). We have reviewed the record, and are not persuaded that it is reasonably probable the jury would have agreed with Acacia had the court given its negotiation history instruction. Further, Acacia *did* address the parties' negotiation history in closing arguments, and the jury still found breach of contract.

D.    *Acacia Does Not Establish The Trial Court Erred By Declining To Apply The Damages Cap Based On The Confidentiality Exception*

Acacia contends the trial court should have applied the damages cap in Section 13, and erred by "refusing to apply the damages cap as a matter of law" and then "failing to instruct the jury on the scope of the damages cap provision and the parties' dispute regarding it." We disagree. The court determined the damages cap did not apply based on the confidentiality exception to the cap, and the testimony at trial from Acacia's own employees supports this ruling. Accordingly, any error by the court in sending the issue to the jury and declining to give a specific instruction on the damages cap was harmless.

1.    *Additional Facts*

The "Limitations of Liability" provision in Section 13 (the "damages cap") states in pertinent part:

38

"EXCEPT FOR BREACHES OF CLAUSE 9 (CONFIDENTIALITY) OR THE NDA . . . , THE TOTAL CUMULATIVE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT, WHETHER ARISING OUT OF BREACH OF CONTRACT . . . OR TORT . . . IN NO EVENT SHALL EXCEED THE AGGREGATE AMOUNT PAID BY ACACIA TO VIASAT PURSUANT TO THIS AGREEMENT." (Bold and uppercase in original.)

Section 9 states, in pertinent part:

> Each Party shall maintain in strict confidence, and will use and disclose only as authorized by the disclosing party, in accordance with the provisions of <u>Non-Disclosure Agreement</u> . . . all information that it receives from the other Party in connection with this Agreement . . . ."

As discussed *ante*, the NDA required the parties to limit disclosure to employees "having a need to know and solely for" the NDA's purpose; namely, to support a "joint business relationship."

During opening statements, Viasat asserted Acacia breached the Agreement by failing to pay royalties. Viasat also stated Acacia shared Viasat's "confidential information in those [design] specifications and in the white paper with its own employees who . . . didn't have a need to see them for the purpose of the transaction, which was to make royalty-bearing products," and that this "violated the NDA that the contract incorporated." Viasat further stated the damages cap did not apply to confidentiality breaches. Acacia's counsel maintained it "never let any of that information that Viasat called its trade secrets go outside the company to anybody else. There was no breach of confidentiality."

The trial witnesses testified about the negotiations that led to the damages cap, and its application. Acacia executive Shah said Viasat initially proposed a $500,000 damages cap for itself, but the parties agreed for the cap to be mutual and limited by the aggregate amount paid by Acacia under the

39

Agreement. Viasat executive Fuerst acknowledged Viasat "enjoyed a limitation of its liability" under the mutually applicable damages cap. The witnesses also testified about Acacia's handling of Viasat's confidential information, both as to the engineers who worked on the later-generation products and in general; we describe that testimony in more detail *post*.

As noted *ante*, the trial court instructed the jury that Viasat claimed Acacia breached the contract, in part, by "disclosing Viasat's confidential Background Information to people who were not authorized to see it." The court also gave an instruction on contract damages, stating Viasat would be "entitled to compensation" that would "place it in the same position" as "if the contract had been properly performed," and did not distinguish between the grounds for breach.

Counsel gave closing arguments. Viasat maintained the damages cap did not apply because Acacia breached the confidentiality clause and NDA. Acacia disagreed, and continued to contend it never let the alleged trade secrets "go outside of the company . . . ."

Acacia's damages expert, Bersin, confirmed during trial that Acacia had paid Viasat an aggregate total of approximately $12,821,000 million under the Agreement. The jury awarded over $49 million dollars in breach of contract damages. The special verdict form did not distinguish between grounds for breach.

Acacia filed a posttrial motion for the trial court to enter judgment "consistent with the damages cap," with contract damages "not exceed[ing] $12,821,000," and maintained the confidentiality exception did not apply. The court denied the motion, stating there was "some lack of clarity" if the issue was for the jury or court, but the result was the same. The court explained the jury's damage award reflected it found "the breach that . . .

40

occurred fell under a provision . . . not limited" by the cap (i.e., confidentiality), and that the court would reach the same result if it made the decision.

2. *The Damages Cap Was Enforceable*

As a preliminary matter, we address whether the Agreement's damages cap is enforceable, and conclude that it is.

Under Delaware law, a contractual limit on damages is "enforceable where damages are uncertain and the amount agreed upon is reasonable." (*Donegal Mut. v. Tri-Plex Sec. Alarm Sys.* (Del. Super. Ct. 1992) 622 A.2d 1086, 1089 (*Donegal*).) Courts "look[] to factors including the length of the contract, the clarity of the language, the clarity of the disclaimed liability, and whether the clause was in boldface type." (*Column Form Tech., Inc. v. Caraustar Indus., Inc.* (Del. Super. Ct. June 10, 2014) 2014 WL 2895507, at *5 (*Column Form*)[9]; see *Donegal*, at p. 1090.) Judicial willingness to enforce damages caps "respects the ability of sophisticated businesses . . . to make their own judgments about the risk they should bear . . . [and] recogniz[es] that such parties are able to price factors such as limitations on liability." (*Abry Partners v. F & W Acquis. LLC* (Del. Ch. 2006) 891 A.2d 1032, 1061 (*Abry*); *ibid.* ["[T]he common law ought to be especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts."].)

Here, Section 13 states the "total cumulative liability of either party under this Agreement . . . . in no event shall exceed the aggregate amount

---

[9] "In Delaware, unpublished opinions are 'not necessarily stare decisis' but warrant great deference." (*Kanno v. Marwit Capital Partners II, L.P.* (2017) 18 Cal.App.5th 987, 1002 fn. 5; see Del Sup. Ct. R. 14; Del. Ch. Ct. R. 171; Del. Super. Ct. Civ. R. 107; *Case Financial, Inc. v. Alden* (Del. Ch. 2009) 2009 WL 2581873, at *6, fn. 39 ["unpublished opinions have precedential value" in Delaware].)

paid by Acacia . . . pursuant to this Agreement." (Bold and uppercase typeface omitted.)

Damages were uncertain, because Acacia's payments were based in part on royalties for future sales (along with the fixed fee), and the "aggregate" amount or fee paid is a reasonable limit recognized in Delaware case law. (See, e.g., *Column Form, supra,* 2014 WL 2895507, at \*4–6 ["aggregate fee" cap in distribution agreement was enforceable, even though parties disputed whether cap was based on $75,000 advanced payment alone or also on $425,000 in consulting fees; deferring motion to limit damages to $75,000 amount, pending further discovery]; *eCommerce Indus. Inc. v. MWA Intelligence, Inc.* (Del. Ch. Oct. 4, 2013) 2013 WL 5621678 (*eCommerce*), at pp. \*5, 18, 45 [enforcing cap based on "aggregate fees" paid by licensee (i.e., $950,000 for exclusive license), where the "breach of contract claim [fell] under the express terms" of the cap and was not subject to its exceptions; citing "sophisticated nature of the parties"].) Section 13 is also clear and set forth in prominent typeface. (See *Column Form*, at \*5 [cap was "clear and unambiguous," and in "capital letters and . . . bold typeface"]; *Donegal, supra,* 622 A.2d at p. 1090 ["language is clear"].) Indeed, there is no dispute as to the potential damages cap: the $12.8 million aggregate amount paid by Acacia.

Accordingly, we disagree with Viasat that the above cases are inapplicable, or that Section 13 should be based on the amount Acacia should have paid. The cases cited by Viasat involved total lack of payment and are thus distinguishable. (See *Web Analytics Demystified, Inc. v. Keystone Solutions LLC* (D. Ore. Aug. 25, 2015) 2015 WL 5032048, at \*1, 5; *Tibco Software Inc. v. Mediamath, Inc.* (Del. Super. Ct., 2019) 2019 WL 3034781, at \*1.)

Further, although we have concluded the damages cap is enforceable on its face, the record would provide an additional reason to reject Viasat's position. It was Viasat that first proposed a small damages cap solely in its own favor, but agreed to a mutual cap with a limit of aggregate fees paid by Acacia. And Fuerst admitted Viasat "enjoyed a limitation of its liability" under the cap. Viasat cannot now claim the provision is unreasonable because it is Acacia that could benefit from it.

3. *The Trial Court Properly Determined The Confidentiality Exception Applied*

We now turn to the confidentiality exception to the damages cap, and conclude the trial court properly determined the exception applied here.

The confidentiality exception to Section 13 states: "Except for breaches of clause 9 (confidentiality) or the NDA . . . ." Acacia argues the exception "applies only if Viasat seeks contractual damages *for* breach of the confidentiality provision or the NDA" (adding on reply that the damages also must be "received"). In other words, Acacia suggests the term "for breaches" in Section 13 means "for damages sought and received for breaches . . . ." Viasat maintains the exception simply requires a "breach[] of Acacia's confidentiality obligations under either Section 9 . . . or the . . . NDA."

We need not resolve the parties' interpretative disagreement, because even if we applied Acacia's interpretation, Acacia does not show Viasat failed to seek and receive damages for a breach of confidentiality. The record reflects that Viasat did so, and the evidence at trial also established Acacia's breached its confidentiality obligations.

We begin with Viasat's request for, and receipt of, damages for a breach of confidentiality. Although Viasat did not allege a breach of confidentiality in its complaint, variance between pleading and proof is immaterial, absent

43

prejudice. (Code Civ. Proc., § 469.) At trial, Viasat argued in opening and closing statements that Acacia breached its confidentiality obligations (Acacia argued to the contrary), and Viasat elicited testimony that Acacia did not limit internal distribution of its confidential information. The jury instructions stated Viasat claimed a breach of both royalty and confidentiality duties, and neither the contract damages instructions, nor the special verdict form, distinguished between the grounds for breach. The jury then awarded Viasat $49 million in contract damages. As the trial court observed, this award was in excess of the damages cap—supporting an inference that the jury found a breach of confidentiality and awarded damages for it, such that the confidentiality exception to the cap applied. (See *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 550 fn. 6 [" 'general verdict implies a finding in favor of the prevailing party of every fact essential to the support of his action or defense' "]; *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1157 (*Tavaglione*) [under general verdict rule, "general verdict will be sustained if any one count is supported by substantial evidence and is unaffected by error"].)[10]

Acacia's arguments on this point lack merit. Acacia contends "Viasat sought only royalties" for contract damages, and "related late fees," citing testimony by Viasat damages expert Prowse that "his calculations for

---

[10] The general verdict rule provides guidance when, as here, the verdict (i.e., on breach of contract) does not involve inconsistent special findings. (Cf. *Tavaglione, supra*, 4 Cal.4th at pp. 1157–1159.) The part of *Tavaglione* cited in Acacia's briefing to contend the rule is inapplicable was discussing assessment of damages when there *are* special findings, which there were not on the breach of contract verdict here. (*Id.* at p. 1159 ["duplicative recovery . . . is . . . prohibited," but "where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages"].)

contract damages were for how much 'Acacia should have paid Viasat [in] *royalties*' " and a reference by Viasat's counsel during opening statements to "our total contract damages, royalties owed under the contract . . . ." But Viasat contends it "pursued contract damages for *all* of Acacia's contractual breaches, and argued that *all* of them—*including* breaches of the confidentiality obligations—damaged Viasat by depriving it of royalties that Acacia would have paid had the contract been fully performed." Essentially, Viasat's position is that "[u]npaid royalties are an appropriate measure of damages" for "confidentiality violations," including the late fees related to such royalties. Acacia identifies no authority foreclosing Viasat's approach to measuring damages.

We now address the evidentiary record, and conclude the evidence at trial supports a breach of confidentiality and resulting damages.

Section 9 requires each party to maintain information "in strict confidence" and to use it "only as authorized" and "in accordance" with the NDA, which itself limits disclosure to employees who "need to know" to support the parties "joint business relationship." Thus, under Section 9, and the NDA by reference, Acacia was required to limit distribution of Viasat's protected information to employees supporting the joint business relationship with Viasat. The record contains ample, undisputed evidence from Acacia's own employees that Acacia violated these obligations in two ways, causing Viasat to incur damages.

First, Acacia shared Viasat's confidential information, including design specifications, with its engineers for purposes of designing its own later-generation products—not for supporting the joint business relationship with Viasat. Acacia executive Shah acknowledged engineers Humblet and Martin were "not . . . isolated from Viasat-furnished information from Everest" (while

45

claiming Acacia "tr[ied]"), and Humblet admitted his use of Everest specifications "wasn't for the purpose of supporting a business relationship with Viasat."

Second, Acacia did not limit access to Viasat's confidential information, in general, to those with a need to know for purposes of the parties' business relationship. Shah testified Viasat's information "never went outside of Acacia," it only went to engineers with "a need to know," and everything associated with Everest was in a restricted folder in Acacia's database. However, he admitted "all the engineers who were working on the backwards compatible products had access" to the database. Martin testified he did not know if only certain people had access to the Everest folder and, to his knowledge, no one was locked out. And, Humblet acknowledged the Sky low-level specification had a link to the Everest one. In addition, as noted *ante*, Rasmussen had asked another executive to give Humblet the Viasat white paper (i.e., that Viasat had given Acacia) on a USB drive. Fuerst testified at trial that the white paper had a confidentiality clause, and was "valuable technology." Rasmussen's request further suggests Viasat's confidential information did *not* always stay within a restricted part of Acacia's database.[11]

_____

11    We address a remaining point. Acacia argued that Viasat's interpretation of the confidentiality exception "swallow[ed] the . . . rule" of the damages cap, citing *eCommerce*. We have explained that Viasat prevails even under Acacia's interpretation, but note *eCommerce* is distinguishable and also disagree with Acacia that "virtually any breach" here would involve confidentiality. (*eCommerce*, *supra*, 2013 WL 5621678, at *45 [confidentiality and IP exceptions to damages cap did not apply; court noted it "found no breach of confidentiality" and "mere fact" claim involved IP was insufficient for exception]; see, e.g., *CLP Toxicology, Inc. v. Casla Bio Holdings LLC* (Del.Ch. 2021) 2021 WL 2588905, at *1, 11–12 [denying motion to dismiss breach of contract claim for failure to provide access to corporate books].)

In sum, the trial court properly determined the confidentiality exception to the damages cap applied, and any errors by the court in not deciding the issue as a matter of law or not instructing the jury on the issue were harmless.

E.    *The Implied Covenant Claim Fails Because The Agreement Addresses The Conduct At Issue*

Acacia contends it cannot be liable for breach of the implied covenant of good faith and fair dealing as a matter of law, because the Agreement addressed the conduct at issue.  We agree.

1.    *Applicable Law*

Under Delaware law, "[th]e implied covenant of good faith is a 'cautious enterprise' that 'is "best understood as a way of implying terms in the agreement," whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.' " (*Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC* (Del. 2019) 202 A.3d 482, 506–507, citations omitted (*Oxbow*).)

" 'Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract.' " (*Oxbow, supra*, 202 A.3d at p. 507.)  " 'Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a "free-floating duty . . . unattached to the underlying legal document." ' " (*Nemec v. Shrader* (Del. 2010) 991 A.2d 1120, 1126, fn. 18 (*Nemec*).)

"As such, the implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent'

47

concerning the matter at hand.' " (*Oxbow*, *supra*, 202 A.3d at p. 507, footnote omitted; *ibid.* [" 'the covenant is a limited and extraordinary legal remedy' "].)

2. *Analysis*

Acacia argues "there can be no recovery for breach of the implied covenant where, as here, the contract speaks to the conduct in question." The Agreement and procedural history support this argument.

As reflected in the trial record, and the arguments on appeal, Viasat's position on the contract issues is essentially that Acacia breached the Agreement by incorporating Viasat's IP in its later-generation products without paying applicable royalties (due under Section 4(b)), as well as by disclosing Viasat's confidential information in violation of Section 9 and the NDA (which we address in connection with the damages cap under Section 13). Acacia's response, in substance, is that it did not incorporate Viasat's IP within the meaning of the Licensed Product definition in Section 1(k), it had a royalty-free license to use Viasat's IP in Section 3(b), and it did not breach its confidentiality duties in Section 9 or the NDA. The disputed contractual issues are squarely encompassed by the Agreement language. Because the Agreement was not " 'truly silent' " on the disputed issues, the implied covenant does not apply. (*Oxbow*, *supra*, 202 A.3d at p. 507.)[12]

Viasat's arguments to the contrary lack merit.

First, Viasat argues "Acacia breached the implied covenant by illicitly copying Viasat's intellectual property . . . and then attempting to cover it up," and Acacia has forfeited any substantial evidence challenge to the jury's

---

[12] We accordingly disagree with the trial court's finding in its JNOV order that the Agreement had a "gap" to "the extent that [it] does not specify" when Acacia "may begin to" use Viasat's IP without paying royalties. The Agreement addresses the conduct at issue.

48

implied covenant verdict by not discussing the purported evidence of misconduct. As we explain *post* in addressing costs of proof, this case is not about copying or purported deceit, but, rather, is about whether Acacia's use of Viasat's IP without paying royalties was permitted under the Agreement (and, for misappropriation, whether its use exceeded the scope of the license in the Agreement). Indeed, Viasat concedes the "central purpose of the License Agreement was to require Acacia to pay royalties when it sold products incorporating Viasat's [IP]." Accordingly, Acacia's briefing reasonably and persuasively focuses on the dispositive *legal* issue: the Agreement covered the conduct at issue.

*Sheehan v. AssuredPartners, Inc.* (Del. Ch. May 29, 2020) 2020 WL 2838575, cited by Viasat, involved an allegedly bad faith employment termination that was not addressed by the employment agreement, and is inapposite to the situation before us. (*Id.* at pp. 3, 11 [employee who alleged employer had falsified records to justify firing could state a claim for breach of the implied covenant; agreement addressed firing for cause or without cause, but not termination done in bad faith].)

Second, Viasat contends: "Acacia misses the point. If the Agreement did not *expressly* forbid Acacia from copying Viasat's technology to make backwards compatible products, and then concealing and lying about its conduct to avoid royalty payments, the implied covenant of good faith and fair dealing filled the gap and protected Viasat from those underhanded tactics. And if the Agreement *did* forbid that conduct, then Acacia is undisputedly liable." It is Viasat that is mistaken: there was no gap to be filled. The Agreement did not prohibit "copying . . . to make backwards compatible products," "concealing," or "lying," but, again, that is not the

49

conduct at issue.[13] The implied covenant cannot expand the scope of the contract because Viasat believes it was wronged in additional ways. (*Oxbow, supra*, 202 A.3d at p. 507; *Nemec, supra*, 991 A.2d 1120, 1126, fn. 18; see *Airborne Health, Inc. v. Squid Soap, LP* (Del. Ch. 2009) 984 A.2d 126, 146 ["implied covenant is not a means to re-write agreements"].)

We conclude the breach of implied covenant claim fails as a matter of law, and the judgment must be reversed, in part, as to this claim.[14]

F.      *The Misappropriation Claim Fails Because Viasat Consented To Acacia's Use Of Its Trade Secrets*

Acacia argues the judgment on trade secret misappropriation must be reversed, because the Agreement authorized its use of Viasat's trade secrets. We agree that Acacia's use was authorized.

1.      *Additional Facts*

Section 4 addresses, in relevant part, the "License" and "Recurring License Fee." Section 4(a) provides:

> "VIASAT hereby grants to ACACIA for the Term of this Agreement a limited, worldwide, nonexclusive, non-transferable right and license (i) to make, have made, use, reproduce and make derivative works of the Licensed Materials, solely for the design, simulation, implementation and manufacture of Licensed Products, and (ii) to reproduce, make, have made, use, sell, offer to sell, import, export or otherwise distribute

---

13      Section 8(c) does state the "Agreement allows [Acacia] to copy any Background Information and/or Licensed Materials . . . only to the extent expressly provided herein . . . ." As we explain *post*, Acacia's license authorized it to use Viasat's IP to develop and sell Licensed Products, including backwards compatible ones.

14      Because we conclude Viasat's implied covenant claim fails as a matter of law, we do not address the parties' further arguments regarding the claim, including whether the implied covenant damages award was subject to the damages cap.

Licensed Products incorporating the Licensed Materials on a worldwide basis. Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use."

Section 4(b) states:

"The foregoing license is granted . . . subject to: (i) [Acacia's] full payment of all [fixed fee] amounts . . . ; and (ii) payment of a per unit Recurring Royalty Fee in accordance with the following table per each Royalty Bearing Product sold by or on behalf of [Acacia]."

Much of the trial testimony about Viasat's alleged trade secrets was sealed, but given our conclusion that Acacia was authorized to use them, we need not discuss the testimony in detail. It suffices to say the trade secrets generally involved technologies relating to the SDFEC Core; Viasat offered testimony from its executives and expert witness Krishnan Narayanan, to show the technologies were trade secrets; and Acacia offered testimony from its engineers and expert witnesses, including Alexander Vardy, to show the technologies were common, previously developed, and/or already published or otherwise disclosed.

On the misappropriation claim, the jury was instructed that Viasat had to prove, among other things, that it owned the described technologies; they were "trade secrets at the time of the misappropriation"; "Acacia improperly acquired, used, or disclosed the trade secrets"; "Acacia was unjustly enriched"; and this "acquisition, use, or disclosure was a substantial factor in causing Acacia to be unjustly enriched." Pertinent to our analysis here, the jury found Acacia "improperly acquire[d], use[d], or disclose[d]" each trade secret at issue.

2. *Applicable Law*

Although the Agreement is governed by Delaware law, Viasat brought its trade secret misappropriation claim under California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq., hereinafter CUTSA).

Under CUTSA, misappropriation includes "use of a trade secret of another without express or implied consent" by one who "[u]sed improper means to acquire knowledge of the trade secret" or knew that knowledge of the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." (Civ. Code, § 3426.1, subd. (b)(2)(A), (B)(ii); accord, *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 864 (*Bunner*).)

A party asserting trade secret misappropriation must prove "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665.) These issues generally implicate questions of fact subject to substantial evidence review (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 300–301), but issues involving legal interpretation can be resolved as a matter of law when the material facts are not in dispute. (Cf. *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [applying de novo review in employment case, where "issues . . . deal[t] solely with interpretation of a statute and application of statutory language to the undisputed facts"].)

3. *Analysis*

Acacia contends Viasat authorized use of its trade secrets, because "Acacia was permitted to use Viasat's alleged trade secrets when making

52

royalty-bearing, Licensed Products," and "Viasat's own witnesses claimed . . . Sky, Denali, and Meru . . . were royalty-bearing, Licensed Products." We agree.

Trade secret misappropriation based on use requires a lack of "express or implied consent." (Civ. Code, § 3426.1, subd. (b)(2)(B)(ii); see *Bunner*, *supra*, 31 Cal.4th at p. 874; see 1 Milgrim on Trade Secrets (2017) § 1.01[2][a] n.29 [where "trade secret owner authorized the . . . use . . . at issue," it "cannot be said to constitute misappropriation"]; § 4.05 [it should be "self-evident" that "[c]onduct authorized by a contract is not misappropriation"].) The legislative committee comments to CUTSA noted "[d]iscovery under a license from the owner of the trade secret" had been recognized as a proper means of acquiring the trade secret of another. (Civ. Code, § 3426.1(b), Leg. Comm. cmt. (1984 Addition).) We will "consider case law from other jurisdictions applying similar sections of the Uniform Act." (*Ajaxo, Inc. v. E\*Trade Fin. Corp.* (2020) 48 Cal.App.5th 129, 160, fn. 9.) *Babcock & Wilcox Co. v. Areva NP, Inc.* (Va. 2016) 292 Va. 165 (*Babcock*), cited by Acacia, is instructive.

*Babcock* involved a sublicense agreement that provided for a "perpetual, worldwide, sub-license to . . . use . . . Nuclear Technology . . . for all purposes, without restriction, in the field of . . . commercial nuclear services to OTSG plants." (*Babcock, supra*, 292 Va. at p. 173.) It also provided that "[f]or the use as defined in this Sub-License at [identified] OTSG plant sites . . . the Grantee agrees to pay . . . a royalty of four percent . . . ." (*Ibid.*) The licensee prevailed at a jury trial on claims for breach of contract and trade secret misappropriation, based on allegations that the sublicensees failed to pay royalties and "us[ed] . . . exclusive technology, which was 'subject to' the Sub-License, without . . . authorization

. . . and 'without compensat[ion] . . . .' " (*Id.* at p. 174.)  On appeal, the sublicensees disputed they misappropriated the technology, contending their use was authorized under the parties' agreement, and the Virginia Supreme Court agreed and reversed the judgment.  (*Id.* at p. 206, 208.)  The court stated "[t]here can be no misappropriation where . . . use of a trade secret ha[s] been expressly authorized by contract."  (*Id.* at pp. 206–207.)  The court further stated "[t]he royalty provision . . . was not a limitation on the scope of the right to use [the licensee's] exclusive technology," but, rather, "a provision requiring compensation for use of [the licensee's] exclusive technology at specifically identified . . . sites."  (*Id.* at p. 208; *ibid*. [if sublicensees breached "duty to pay royalties," that "would not convert [the] breach-of-contract claim into a statutory right of action for misappropriation"]; see Milgrim, § 4.05 [royalty provision "provides a helpful illustration" that a breach of contract is "not necessarily a misappropriation," citing *Babcock*].)

Courts addressing other types of intellectual property have applied similar reasoning.  (See, e.g., *Graham v. James* (2d Cir.1998) 144 F.3d 229, 235–238 [affirming breach of contract for licensee's failure to pay royalties, but vacating copyright infringement award because, inter alia, royalties were a separate covenant, not a condition of the license].)[15]

---

15    See also, e.g., *Tessera, Inc. v. Int'l Trade Comm'n* (Fed. Cir. 2011) 646 F.3d 1357, 1370–1371 (affirming patent exhaustion determination, and disagreeing licensee's sale to customers was "unauthorized until [plaintiff] receive[d] the royalty payment"; "[T]here is nothing in any of the license agreements to even remotely suggest . . . payment of royalties . . . operates to convert . . . authorized sales into unauthorized sales."); compare *Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc.* (S.D.N.Y. Aug. 23, 2012) 2012 WL 4074419, at *2–3 (denying summary judgment on patent infringement; "defendants' CDs were not in the literal sense 'Licensed Products,' " where agreement defined licensed product as "CD-Discs 'which are duly reported

*Babcock* is on all fours with the present dispute. The Agreement provided Acacia with a broad license to make and sell Licensed Products, and the undisputed evidence at trial reflected that the later-generation products, Sky, Meru, and Denali, were Licensed Products. We explain.

Section 4(a) provides Acacia with a "limited, worldwide, nonexclusive, non-transferable right and license (i) to make, have made, use, reproduce and make derivative works of the Licensed Materials, solely for the design, simulation, implementation and manufacture of Licensed Products, and (ii) to reproduce, make, have made, use, sell, offer to sell, import, export or otherwise distribute Licensed Products incorporating the Licensed Materials on a worldwide basis." Thus, Acacia's license authorizes it to make and sell Licensed Products, and to use Licensed Materials to do so. Meanwhile, Section 1(l) defines Licensed Products as "any integrated circuits . . . designed . . . or sold by . . . [Acacia] that incorporate all or any part of the Licensed Materials . . . ." Read together, these provisions mean that if Acacia designs *any* chip incorporating *any* Licensed Materials, the result is a Licensed Product that is within Acacia's license to make and sell—*and that Viasat has consented to use of its technology to do so*. (See *Bunner*, *supra*, 31 Cal.4th at p. 874, citing Civ. Code, § 3426.1, subd. (b)(2)(B)(ii) [misappropriation requires lack of "express or implied consent"].)

Further, as in *Babcock*, the royalty provisions do not limit the license, but rather govern payment for its use. (*Babcock, supra*, 292 Va. at p. 208.) Section 4(b) of the Agreement states the license is granted "subject to" the fixed fee and "payment of a per unit Recurring Royalty Fee in accordance with the following table per each Royalty Bearing Product sold . . . ." A

---

and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.' ")

Royalty Bearing Product is defined as a Licensed Product that incorporates Licensed Materials, or, simply, a Licensed Product. In other words, when Acacia sells a Licensed Product—something it is has a license to do under Section 4(a)—it must pay a royalty fee per instance of use.

Viasat maintains that the license provision is limited, and does not extend to Acacia's use of its trade secrets. We are not persuaded.

First, Viasat attempts to distinguish *Babcock*, contending that *Babcock* involved a "broad license that indisputably captured the defendant's conduct," whereas the license here "was more limited, and . . . [did] not extend to incorporation of Viasat's trade secrets into Acacia's backwards compatible products without payment." Not so. The license encompasses *all* Licensed Products, with no exception for backwards-compatible products. As for payment, the license and royalty provisions are separate, as we explain above, and *Babcock* stated that breach of a "duty to pay royalties" does "not convert" a breach of contract claim into one for misappropriation. (*Babcock*, *supra*, 292 Va. at p. 173.) In support of its position, Viasat also cites a case that distinguished *Babcock*, *Darton Environmental, Inc. v. FJUVO Collections, LLC* (W.D.Va. 2018) 332 F.Supp.3d 1022, and impliedly urges us to follow it. *Darton* involved an agreement to inspect a facility, with one of multiple defendants, and has no bearing on this case. (*Id.* at pp. 1027, 1038 [contract allowed defendants to inspect "facility 'solely for the purpose of evaluating a potential business relationship,' " defendants took and used technology, and plaintiff successfully sued; while *Babcock* contract "gave a valid and broad scope to use the technology," the contract at issue was "limited in scope" and with one defendant].)

Second, Viasat contended, while addressing breach of contract issues, that the Agreement has various "restrictions on Acacia's right to use Viasat's

intellectual property," beyond royalty obligations, citing Sections 4(a), Section 8(b), and Section 9 (along with the NDA, by reference). But none of the cited provisions limit the broad scope of Acacia's license. Section 4(a), the license provision, concludes by stating, "Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless [Acacia] has entered into a separate written Agreement with [Viasat] for such use." Section 8(b) similarly states that Acacia may not "reverse engineer" Licensed Materials or Background Information, or "prepare derivative works . . . except with respect to the purposes of the Licensed Products." These provisions emphasize that Acacia's authorized use of Viasat's IP, including Licensed Materials like the SDFEC Core, is limited to Licensed Products. But, again, "Licensed Products" is defined such that *any* incorporation of Licensed Materials into a chip designed by Acacia *results* in a Licensed Product. As for the Section 9 confidentiality obligation, and the NDA incorporated by reference, violating these provisions may implicate a breach of confidentiality (as we discuss above), but they have no bearing on Acacia's license to make and sell Licensed Products.

Turning to the record, Viasat executives testified unequivocally that they considered work on Licensed Products to be authorized and also that Acacia's later-generation products were Licensed Products. Chitre stated Acacia engineers could use Viasat's confidential information to "work[] on the Everest product, which was a royalty-bearing product." As noted above, when asked about what triggered the lawsuit over the later-generation products, he stated in part, "These are licensed products and there was royalties." Fuerst similarly testified that Licensed Products are "products that Acacia is authorized to sell as long as it pays the royalty," even with late

57

fees, and agreed it was his "testimony . . . that Sky, Denali, and Meru are all licensed products."

Given the broad scope of Acacia's license and this undisputed evidence, we conclude Viasat consented to Acacia's use of its trade secrets and cannot establish trade secret misappropriation. (See *Babcock*, *supra*, 292 Va. at p. 206 ["Given our interpretation of the Sub–License, we agree with . . . defendants that they cannot be liable for misappropriating trade secrets as a matter of law."]; cf. *MPAY, Inc. v. Erie Custom Comp. Applications, Inc.* (8th Cir. 2020) 970 F.3d 1010, 1016–1019 [affirming denial of preliminary injunction, where software developer did not establish likelihood of success on misappropriation claims under federal Defend Trade Secrets Act and Minn. UTSA; defendants "demonstrated . . . their copying, disclosure, and possession of . . . source code were authorized by the . . . [a]greement," citing *Babcock*].) The judgment must be reversed as to misappropriation.

Viasat offers multiple arguments for why the misappropriation judgment should be affirmed. None is persuasive.

First, Viasat contends that under CUTSA, a misappropriation claim "does not affect . . . contractual remedies" (Civ. Code, § 3426.7, subd. (b)) and " 'breach of contract claims . . . are not displaced by [C]UTSA.' " That CUTSA does not displace contract claims is neither contested, nor relevant, and Viasat's authorities are inapposite. (*Angelica Textile Servs., Inc. v. Park* (2013) 220 Cal.App.4th 495, 498–499, 508 [business sued competitor and former employee under CUTSA and for breach of contract; reversing judgment on contract claim, explaining CUTSA "does not displace breach of contract claims" and contract claim was based on violation of a noncompete agreement, not misappropriation of a trade secret]; *Silvaco Data Sys. v. Intel Corp.* (2010) 184 Cal.App.4th 210, 215, 232–236, disapproved on other

58

grounds in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310 [software developer sued customer of competitor that allegedly misappropriated trade secrets; claims did not sound in contract and were superseded by CUTSA, except UCL claim]; Milgrim, § 4.05 [both breach and misappropriation may exist, including where there is an "express contractual prohibition" and, possibly, where "licensee operat[es] outside scope of the license grant"].)[16]

More generally, there is no dispute that in appropriate circumstances, a plaintiff potentially can recover both breach of contract and misappropriation damages. (See, e.g., *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 40, 62–64 [plaintiff proved breach of NDA and misappropriation based on same evidence involving disclosure to and use by third party; trial court erred in granting nonsuit on damages for misappropriation, while denying JNOV on contract damages].) But with this Agreement, on this record, Viasat cannot establish trade secret misappropriation.

Second, Viasat contends Acacia "wrongly assumes that [its] contract claim and trade secret claim both arise from . . . failure to pay royalties due for an otherwise authorized use of Viasat's technology," and explains how the jury could find both breach of contract and misappropriation (e.g., by finding a breach of confidentiality, and misappropriation). Acacia's point, as we understand it, is not that the jury findings are irreconcilable, but that Viasat's *arguments* are inconsistent. We agree. On breach of contract,

_____

16      Viasat states treatises recognize both contract and misappropriation claims may lie "where a trade secret has been disclosed pursuant to a contract and the disclosee operates in a manner that is adverse to the trade secret owner's interests." Milgram, which Viasat quotes here, was framing a *question*; namely, if these events occur, whether there is a breach of contract, misappropriation, or both—and concluded "[s]everal rules" apply. (Milgrim, § 4.05.) One such rule, as noted *ante*, is that "[c]onduct authorized by a contract is not misappropriation." (*Ibid.*)

Viasat's primary contention is essentially that Sky, Denali, and Meru are Licensed Products, and Acacia failed to pay required royalties on them. But on misappropriation, Viasat contends Acacia's license is limited, such that it does *not* encompass Acacia's development and sale of Sky, Denali, and Meru. These positions are in conflict. Nor does Viasat resolve that conflict by arguing that the Agreement "requires Acacia to pay royalties to Viasat for any use of the technology, whether authorized or not." The Agreement grants Acacia a license to design and sell Licensed Products, and requires a royalty payment when it sells them. (Section 4(a)-(b), 1(m).) Unauthorized use not resulting in a Licensed Product, and thus beyond the license scope, is conceivable (e.g., if Acacia gave Viasat's Licensed Materials to a third party), but royalties would not accrue. And, more importantly, there is no evidence that such use occurred here.[17]

Finally, Viasat advances a policy argument; namely, that allowing both contract and trade secret remedies advances CUTSA's goal of "maintaining ' "standards of commercial ethics." ' " Viasat contends "trade secret remedies guard against misuse . . . beyond the limits of the license," and, otherwise, licensees would owe only "contractually required royalties." (Italics omitted.) Applied here, this argument relies on an assumption we reject: that Acacia was operating beyond the scope of its license. We also disagree a judicial remedy is the only limit on corporate conduct. (Cf. *Abry, supra*, 891 A.2d at p. 1061 ["Judicial decisions are not the only way that commercial norms of fair play are instilled. . . . Having a bad reputation is likely to be costly . . . ."].) Viasat relatedly argues Acacia falsely claimed its products "did not utilize Viasat's SDFEC" and sought to "conceal its use," so ordering only

---

[17] Indeed, as noted above, Viasat executive Fuerst testified that Viasat would "definitely not" have sued if Acacia "had paid royalties."

royalty payments would "permit Acacia to escape all responsibility for what the jury found was its willful and malicious deception." The jury found misappropriation, not deception, and we are reversing. In any event, as we explain *post* in addressing costs of proof, Acacia could reasonably take the position that it independently and/or permissibly developed its later-generation products.[18]

In sum, we will affirm the judgment as to breach of contract, but we will reverse the judgment as to the claims for breach of the implied covenant claim and trade secret misappropriation.[19]

---

[18] Acacia further argues there was no substantial evidence that Viasat's technologies were trade secrets. Given our conclusion that Acacia's use was authorized, we do not reach this argument. We also need not, and do not, reach Viasat's cross-appeal argument that the $1 trade secret damage award was improper. Even if we were to reach it, we would note that despite the trial court's conclusion that there was "no manifest injustice" in that award, and an appellant's obligation to show prejudice, Viasat does not address prejudice until its cross-appellant's reply brief and forfeits the issue. (*Hoffman, supra,* 179 Cal.App.4th at p. 772 [appellant must establish prejudice]; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["[p]oints raised for the first time in a reply brief will ordinarily not be considered"].)

[19] In the "Conclusion" sections of its briefs, Acacia asks that if we reverse the judgment, we reverse the trial court's costs award too, citing one case without analysis. This is insufficient to place the costs award before us, and we take no position as to proceedings on remand. (Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "[s]tate each point under a separate heading or subheading summarizing the point"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)

## II.    *Viasat's Cross-Appeal*

Viasat contends the trial court abused its discretion in denying its motion for costs of proof, which was based on Acacia's refusal to admit to certain requests for admission.  We conclude this argument lacks merit.  Acacia took a consistent and defensible, if aggressive, position throughout the dispute and litigation, even it did not prevail in certain respects.[20]

### 1.    *Additional Facts*

Viasat directs this court to internal Acacia communications, letters between the parties, and litigation proceedings to support its position that Acacia misused its information and improperly denied doing so until trial.  We summarize these events, as well as Viasat's requests for admission.

Acacia's executives had considered different options for its later-generation products.  One Acacia PowerPoint presentation addressed FEC options, and a slide for "Backwards-Compatible FEC Only" listed "Potential IPR [IP rights] concerns with ViaSat?" as a "con."  This was not listed as a "con" in a subsequent slide for "Backwards Compatible FEC and new FEC."

---

[20]    We disagree with Acacia that the costs of proof order is not properly before us, because Viasat did not separately appeal it.  The judgment omitted fees, consistent with that order.  Liberally construing Viasat's cross-appeal from the judgment, as we must (*K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 882–883), we conclude the appeal encompasses the order.  (See Code Civ. Proc., § 906 [on appeal from judgment, reviewing court may review intermediate order that "involves the merits or necessarily affects the judgment . . . appealed from or which substantially affects the rights of a party"]; cf. *Lakin v. Watkins Assoc.'d Indus.* (1993) 6 Cal.4th 644, 656 [costs of proof order *after* judgment was appealable where, inter alia, it would "not become subject to appeal after some future judgment"], emphasis added.)  Acacia also does not show it was prejudiced by the notice of appeal. (*K.J.*, at p. 882.)

As noted *ante*, Acacia's later-generation products included backwards-compatible and non-backwards-compatible modes.

In October 2012, Acacia cofounder and executive Benny Mikkelsen advised board member Eric Swanson and others over email that backwards compatibility was very important for existing customers. Swanson replied, "Doesn't backward compatibility force us to use via sat fec? that would suck." Mikkelson said, "The encoding for our current ASIC is not protected by ViaSat only the decoder is encrypted. Our . . . ASIC will use a similar encoder and our own FEC team are making a decoder that matches ViaSat performance so we don't need to pay anything to ViaSat." Later that month, cofounder and former president Rasmussen sent the previously-described message over personal email to another executive, to give Humblet the Viasat white paper on a USB stick.

In early 2014, Acacia and Viasat were in talks about partnering on a new project, but Acacia ended the talks. Over internal email, Acacia executives discussed questions Viasat might have, including whether Viasat would think it had "an IP case" if Acacia said it was supporting backwards compatibility and who Acacia's supplier was (i.e., if it was not working with Viasat). Rasmussen said it would be "safer to say" there would not be backwards compatibility and, on the supplier issue, thought they could "hide behind confidentiality." Mikkelsen proposed emphasizing "backward compatibility is not important," in part. Around this time, Shah emailed Rasmussen, stating, "[T]hinking ahead to the future if we have to add their FEC into other products for backward compatibility (I know we can do our own as we did for Sky [REDACTED]), it will kill our margins."

Acacia and Viasat exchanged several letters between 2013 and 2015. In March 2013, Shah wrote to counsel for Viasat, responding to "potential concerns" that Viasat had raised. He stated Acacia had not used Background Information "outside the scope of the licenses," and that Acacia was "free to independently develop . . . new cores . . . ." He also stated Viasat's information was in a "restricted directory . . . accessible only by personnel with [a] need to know . . . ." In July 2015, counsel for Viasat sent Shah a letter stating it learned Acacia was selling a backwards-compatible module and "cannot understand" how the module "might provide such backwards compatibility without containing some or all of the 'SDFEC Core' or proprietary design specifications . . . ." In August 2015, counsel for Acacia responded, stating the module did "not contain or utilize the 'SDFEC Core' . . . or derivative thereof" and Acacia "independently developed its own distinct product." In November 2015, Acacia's counsel responded to another Viasat letter which apparently restated Viasat's concerns (only Acacia's letter appears to be in the record, and we thus rely on Acacia's description). Acacia reiterated the module was "an independently developed product rather than a copy of the SDFEC Core," and also asserted Acacia "did not have access to the details or coding of the SDFEC Core."

Litigation commenced in January 2016, and discovery followed. In August 2016, Viasat served requests for admissions (RFAs) on Acacia. Pertinent here, Viasat asked Acacia to admit: it "utilized [Viasat's] design specification documents for the SDFEC Core . . . to determine the parameters necessary" to design backwards compatible Acacia products; it "design[ed] [its] latest-generation products to interoperate with prior-generation products"; Sky and Denali "incorporate[d]" Background Information and Licensed Materials; and Acacia's products used various technologies (which

64

Viasat represents correspond to its trade secrets). Acacia denied these requests.

In depositions of Acacia witnesses in 2017, Viasat asked about Acacia's use of the SDFEC Core in developing Sky and Denali. Senior chip architect Pellach said they "didn't do any copying," but they had the specification, were "allowed to use it," and were "also allowed to build new products . . . ." Engineer Peter Monson initially denied Acacia copied Viasat's low-level specifications from Everest, but acknowledged there were similarities; he then admitted he sent an email stating he copied from the Everest specification, but maintained, in part, that the email indicated only "some portion" was used and did not specify "which specification." Martin, who wrote the source code for Acacia's later-generation products, testified he used Viasat's code as a "starting point" and "did not change some of the lines"; he preferred this description to "copied." Later, in a 2018 brief for a summary judgment motion, Acacia maintained it "independently developed" its later products. In a 2019 brief opposing a Viasat motion for summary adjudication, Acacia disputed copying specifications to create backwards compatible products, reiterating, in part, that it independently developed its products; the Viasat materials "provided assistance"; and "mere use" does not trigger a royalty.

As noted above, in its opening statement at trial, Acacia acknowledged that "of course" it copied certain documents from Viasat, but stated that the "question here is whether that [was] something Acacia was allowed to do . . . ."

Following trial, Viasat included a request for costs of proof under Code of Civil Procedure section 2033.420 in its motion for attorney's fees and costs, citing Acacia's failure to admit the RFAs and its admission to copying at trial.

As discussed *post*, section 2033.420 permits a prevailing party to recover costs when the opposing party denied RFAs and does not establish an applicable exception, such as reasonable grounds for denial. Acacia opposed the motion, arguing the RFAs did not ask about copying, but instead dealt with disputed Agreement terms like "incorporate," and it had consistently denied incorporation, including by "present[ing] evidence and argument at trial . . . ." Acacia also maintained it properly denied the RFAs on utilization of design specifications and use of trade secrets, given its limited and/or permitted use of the information, and "presented evidence at trial" in this regard.

The trial court denied the motion. The court noted Acacia's argument that it presented evidence at trial disputing the matters at issue in the RFAs. The court explained that Acacia's "position over the course of this lawsuit appears to have been that it 'used certain design parameters strictly for backward-compatibility modes' when it developed new products, but that that use 'comprise[d] a technologically-minor aspect' of the new products." The court found "[t]he jury agreed," citing its minimal misappropriation damages award. The court then observed:

> "[T]his is a highly technological case involving sophisticated and high-level technology products. Parsing the precise meaning of words like 'use,' 'utilize,' and 'incorporate,' particularly when the nuance of the case rests upon *how* those new products 'use' or 'incorporate' older technologies, is not the kind of scenario for which a failure to admit should warrant an award of attorney fees."

The court concluded the exceptions for "reasonable grounds" and "other good reason" were satisfied.

2.     *Applicable Law*

"Requests for admissions differ fundamentally from other forms of discovery." (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 (*Stull*).)  Their

"primary purpose . . . is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 (*Brooks*); see *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 115 (*Orange County*) [" 'Requests for admission are not restricted to facts or documents, but apply to conclusions, opinions, and even legal questions.' "].)

Under Code of Civil Procedure section 2033.420, "[w]hen a party propounds requests for admission of the truth of certain facts and the responding party denies the requests, if the propounding party proves the truth of those facts at trial, he or she may seek an award of the reasonable costs and attorney fees incurred in proving those facts." (*Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 529 (*Grace*), citing Code Civ. Proc., § 2033.420, subd. (a); see *Stull, supra,* 92 Cal.App.4th at p. 865 [award is "designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission"].)

A trial court shall award costs unless it finds any of the following exceptions: "(1) An objection to the request was sustained or a response to it was waived . . . . [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (Code Civ. Proc., § 2033.420, subd. (b).) The party seeking to benefit from an exception has the burden to establish it. (*Samsky v. State Farm Mutual Automobile Ins. Co.* (2019) 37 Cal.App.5th 517, 523.) When the reasonable ground exception is at issue, the relevant question is " 'whether the litigant had a reasonable, good faith belief he or she would prevail on the issue at trial.' " (*Id.*, at p. 526; accord, *Grace, supra,* 240 Cal.App.4th at p. 529.)

67

We review the court's order denying costs of proof for abuse of discretion. (*Stull, supra*, 92 Cal.App.4th at p. 864.) "An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason." (*Ibid.*)

3. *Viasat Does Not Establish The Trial Court Abused Its Discretion By Denying Costs Of Proof*

The trial court determined Acacia had reasonable grounds or other good reason for denying the RFAs, explaining Acacia's consistent position had been that it used Viasat's technology only in a limited and permissible manner and observing the case was highly technical and an inappropriate scenario for costs of proof. On the record before us, we cannot say the court exceeded the bounds of reason. (See *Stull, supra*, 92 Cal.App.4th at p. 864.)

Viasat's RFAs involved contested issues of contractual interpretation, including the meaning of terms like "incorporate," and essentially sought Acacia's unqualified admission to various uses of Viasat's technology. Acacia explained it denied the RFAs because it maintained it did not incorporate Viasat's technology, and that its utilization and use was otherwise limited and/or permissible, noting it presented evidence at trial on these matters. The trial court accepted Acacia's explanation, and could reasonably do so.

The parties' Agreement contemplated that Acacia could use Viasat's IP to develop Licensed Products on which it paid royalties, as Acacia did for Everest and K2. The dispute here turned on *how* Acacia used Viasat's technology in developing its later-generation products, including whether Acacia's actions went beyond the scope of its license. From the internal Acacia communications during product development, to the party communications from 2013 to 2015, through trial in 2019, Acacia and its witnesses consistently took the position that Acacia was permitted to and did

68

independently develop its later-generation products, and did not incorporate the SDFEC Core or otherwise meaningfully rely on Viasat's technology. Although the jury did not accept Acacia's position, the jury's special verdict was split on the liability issues and it awarded minimal trade secret misappropriation damages (and we reverse the misappropriation judgment altogether). (Cf. *Denver D. Darling, Inc. v. Controlled Environments Const., Inc.* (2001) 89 Cal.App.4th 1221, 1239 [denial of expenses was within court's discretion, where trial court found "each party reasonably believed the contract unambiguously meant something different than the other"].)

Indeed, the litigation events highlighted by Viasat and discussed above actually illustrate the consistency of Acacia's position. For example, Martin indicated in his deposition that while he used Viasat's code as a starting point and kept certain lines, he preferred a term other than "copying"— similar to his trial testimony, where he explained he did not like the term "copy," because although portions of the Everest code had "to be there for backwards compatibility," he "completely rewrote the code." (Cf. *Brooks*, *supra*, 179 Cal.App.3d at pp. 512, 513 [affirming denial of fees where plaintiff "had a reasonable basis, the anticipated testimony of his father," for denying RFA at issue].) Martin also testified at trial that Acacia spent years developing the later-generation products. Pellach likewise indicated at deposition that Acacia did not copy, but rather used the specification and had a right to do so, and maintained at trial that there was no "incorporation" of Viasat's technology. And both Martin and Pellach testified at trial that Acacia could not have incorporated Viasat's SDFEC Core because it used too much power, as did other Acacia witnesses. The trial court briefs cited by Viasat and discussed above likewise reflect that Acacia maintained it independently developed its products.

We disagree with Viasat that Acacia "abandoned its previous denials" and "reversed course" at the start of trial, by admitting to copying Viasat's IP in its opening statement. Viasat's RFAs did not ask about "copying" Viasat's technology. Further, Acacia did not simply admit to copying, as Viasat suggests. Rather, Acacia explained that "[t]he *question* . . . is whether that [was] something Acacia was allowed to do." (Italics added.) This explanation was reasonable, and neither a reversal of position, nor a concession of liability—hence the vigorously-contested, six-week trial.

In sum, the trial court fairly could conclude Acacia had a reasonable, good faith belief at the time it denied the RFAs that it would prevail at trial on the matters at issue. (See *Samsky*, *supra*, 37 Cal.App.5th at p. 526; see, e.g., *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 904 [plaintiff sued companions for, inter alia, negligence and assault, after falling off cliff while intoxicated; denying costs of proof, in part, where court did not exceed bounds of reason in concluding he reasonably believed he would prevail].) Viasat must show this determination was an abuse of discretion, and it fails to do so.

First, Viasat argues Acacia never had reasonable grounds to believe it would prevail, because Acacia "knew . . . it was impossible to make its chips backwards compatible *without* using Viasat's trade secrets or copying Viasat's confidential design specifications." Viasat is essentially dismissing Acacia's litigation position that its limited and/or permitted utilization or use of Viasat's technology did not give rise to liability for either breach of contract or misappropriation—and failing to recognize its RFAs implicated these issues of use. The trial court reasonably could, and did, accept that Acacia's litigation approach justified its denials of the RFAs. Viasat relatedly argues Acacia tried to conceal its conduct, citing Rasmussen's request that Humblet be given the Viasat white paper on a USB drive. Although the request was

70

inconsistent with Acacia's confidentiality obligations, as we discuss *ante*, we disagree it necessarily reflects Acacia's litigation position was unreasonable.

Second, Viasat argues Acacia's denial of the requests for admission caused unnecessary work, by requiring Viasat to "prepare[] for and conduct[] trial believing it would have to prove that Acacia copied its intellectual property and used its trade secrets to design backwards compatible products . . . ." Preparation alone is not compensable, and Viasat does not establish Acacia's denials actually resulted in additional work at trial. (See *Wagy v. Brown* (1994) 24 Cal.App.4th 1, 6 (*Wagy*) ["Expenses are recoverable only where the party requesting the admission 'proves . . . the truth of that matter,' not where that party merely prepares to do so."].) Again, the dispute was over *how* Acacia utilized or used Viasat's IP, including whether Acacia should have paid royalties—matters on which numerous witnesses testified and both sides presented legal arguments, even after Acacia acknowledged copying documents from Viasat in its opening statement.[21]

Third, Viasat's reliance on *Grace*, *supra*, 240 Cal.App.4th 523, and *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634 is misplaced. These cases stand for the proposition that when the losing party offers little or no evidence at trial to support its earlier denial of a request for admission, then denial of costs of proof is unreasonable. In *Grace*, the Court of Appeal reversed an order denying costs of proof to a plaintiff who sought admissions that the defendant failed to stop at a red light and was negligent. (*Grace*, at

---

[21] We note Viasat did not have to prove Acacia's later products were backwards compatible with Everest, which the RFAs also touched upon; this fact appeared to be undisputed by the time Acacia expert Vardy was deposed in 2017. (Cf. *Wagy*, at p. 4 [reversing costs of proof where defendant admitted negligence "for purposes of arbitration," thus "obviating the necessity for proof on that issue"].)

pp. 526, 530.) The defendant later relied solely and concededly on his own belief that the light was yellow, despite a police report and accident reconstructionist finding him at fault and an eyewitness who saw him run the red light. (*Id.* at pp. 530–532.) In *Wimberly*, this court reversed the denial of costs of proof to a plaintiff in a product liability action, in which the defendant manufacturer denied admissions regarding defects and medical expenses and then "failed to produce any witness" on those issues at trial. (*Wimberley*, at pp. 635–636.) Here, in contrast, the trial court fairly could find Acacia had a reasonable position on the disputed matters and anticipated witnesses who could—and did—give testimony consistent with that position. This was more than "a hope or a roll of the dice." (*Grace*, at p. 532).[22]

Finally, Viasat does not establish the trial court improperly denied costs of proof "based solely on the complexity of the case." The court's order focused first on the fact that Acacia had maintained a consistent position on the key disputed issues, including by presenting evidence at trial, and then noted the case was "highly technological" and "not the kind of scenario for which a failure to admit should warrant . . . fees." Viasat does not establish the court's ruling would have differed had it focused solely on Acacia's consistent position throughout the litigation.

Nor does Viasat establish complexity was improper factor for the trial court to consider. Viasat cites *Grace* for its statement that " ' "fact that the request is for the admission of a controversial matter, or one involving

---

[22] *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, also cited by Viasat here, is distinguishable as well. (*Id.* at pp. 735–737 [affirming *grant* of costs of proof in action involving equipment injury to employee, where, inter alia, employer's insurer denied negligence and causation on behalf of employer, despite strong evidence to the contrary].)

complex facts, or calls for an opinion, is of no moment." ' " (*Grace, supra*, 240 Cal.App.4th at p. 528.)  But *Grace*, an automobile accident case, did not have complex facts.  On reply, Viasat cites the original source of the quoted language, *Cembrook v. Superior Court* (1961) 56 Cal.2d 423.  *Cembrook* did not involve costs of proof; rather, it held complexity was not grounds to object to a request for admission.  (*Id.* at pp. 428–430 [issuing writ of mandate to set aside order sustaining objections to request for admissions, including based on "complex medical and scientific facts" in personal injury action].)  It does not follow that a court is barred from considering complexity in assessing whether, as here, a litigant reasonably *denied* RFAs.  The case actually quoted by *Grace, Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, did cite *Cembrook* for law applicable to costs of proof in a dispute over a property boundary—yet did not address complexity in its analysis, and affirmed a denial of costs.  (*Id.* at pp. 732–733, 750–755.)

Courts, including this one, have considered issues implicating complexity, like unsettled law and technical expert witness testimony, in determining whether a party reasonably denied an RFA.  (See *Miller v. Am. Greetings Corp.* (2008) 161 Cal.App.4th 1055, 1066 [reversing costs of proof in negligence case, where law was unsettled; appellants could have "entertained a good faith (albeit ultimately mistaken) belief that they could prevail"]; *Orange County, supra*, 31 Cal.App.5th at pp. 120, 132 [this court reversed costs of proof, in part; stating we were "mindful" the case involved "sophisticated scientific analyses of . . . contamination," and that "where RFAs require sophisticated analyses of technical issues, courts are more willing to credit a party's reasonable belief that it would prevail based on expert opinion evidence"].)  Both parties here introduced testimony by

73

seasoned engineers and engineering professors, as expert or lay witnesses, on disputed issues at trial.

We conclude Viasat does not establish the trial court abused its discretion in denying costs of proof.

DISPOSITION

The judgment is reversed in part as to the claims for breach of the implied covenant of good faith and fair dealing and for trade secret misappropriation, and the judgment and orders are affirmed in all other respects.  The parties shall bear their own costs on appeal.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.